IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| RANDALL MENGES,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>AUSTIN KNUDSEN, Attorney General of the State of Montana; GARY SEDER, Bureau Chief of the Montana Crime Information Bureau; and SARA MALIKIE, Head of the Sexual and Violent Offenders Program for the Missoula County Sheriff's Office, each in their official capacities,<br><br>　　　　　Defendants. | CV 20–178–M–DLC<br><br><br><br>ORDER |

The central question in this case is whether Montana may, in conformance with the United States and Montana Constitutions, force Plaintiff Randall Menges ("Menges") to register as a sexual offender for engaging in consensual oral or anal sex with another male in 1993.  For the reasons stated herein, the Court concludes it cannot.  Accordingly, the Court will afford Menges the relief he requests and enter judgment in his favor.

## BACKGROUND

### I.    Factual Background.

In 1993, Menges, then 18 years old, engaged in sexual activity with two 16-year-old males while employed at a youth foster program and working ranch in

1

Gem County, Idaho. (Doc. 33 at 3.) In response, Idaho charged him with three counts of "Crimes Against Nature," in violation of Idaho Code 18-6605. (*Id.* at 3; Docs. 9-2 at 2; 9-5 at 1.)[1] In 1994, Menges pled guilty to the first count (Doc. 9-2 at 3) and was sentenced to a total of 15 years imprisonment, 5 of which was determinate and 10 years of which was indeterminate. (*Id.* at 2; 9-5 at 1.)[2]

Menges was ultimately incarcerated for approximately 7 years, before serving the remainder of his sentence on probation. Upon release from imprisonment, Menges was required under Idaho law (and still would be required) to register as a sexual offender. *See* Idaho Code § 18-8303(1)(a) (1993); Idaho Code § 18-8304(1)(a) (2020). At some point, Menges re-located to Montana. But he could not escape the registration requirement, because under Montana's Sexual or Violent Offender Registration Act, Menges must register as a sexual offender in Montana. (Doc. 33 at 1, 4.)

This is because, under Montana's Sexual or Violent Offender Registration Act, sexual offenders must, among other things, register "with the appropriate registration agency." Mont. Code Ann. § 46-23-504(1), (2). A "sexual offender"

---

[1] This statute proscribes all "unnatural carnal copulations . . . committed *per os* or *per anum*." *Idaho v. Gomez-Alas*, 477 P.3d 911, 916–17 (Idaho 2020) (meaning any sexual penetration by way of mouth or anus).

[2] Idaho's sentencing scheme permits judges to establish a minimum period of confinement during which a defendant is ineligible for parole (the determinate term) and a remaining period of confinement in which the defendant is eligible for parole (the indeterminate term). *Idaho v. Anderson¸* 266 P.3d 496, 498 (Idaho 2011) (citing Idaho Code § 19-2513).

is anyone who has been convicted of a "sexual offense."  *Id.* § 46-23-502(10).

Critical to this case, a "sexual offense" includes "any violation of a law of another

state . . . for which the offender was required to register as a sexual offender after

an adjudication or conviction."  *Id.* § 46-23-502(9)(b).  Due to Menges' 1994

conviction under Idaho's Crimes Against Nature statute, which is codified at Idaho

Code § 18-6605, he must register as a sexual offender in Idaho.  Idaho Code § 18-

8303(1)(a) (1993); Idaho Code § 18-8304(1)(a) (2020).  Accordingly, pursuant to

the provisions of Montana Code Annotated §§ 502(9)(b), (10), and 504(1), (2),

Menges must register as a sexual offender under Montana law.[3]

Menges officially registered in Montana on December 12, 2018.  (Doc. 33 at

4.)  When registering, Menges was fingerprinted, photographed, and swabbed for

DNA.  (Doc. 33 at 4; Mont Code Ann. § 46-23-504(3).)  He also had to disclose

various private information, including all "email addresses and screen names," a

description of any vehicles owned, his residential address, and his driver's license

number.  (*Id.*)  Menges must notify the State within 3 days of any change in his

residence, employment, or academic enrollment status.  (Doc. 33 at 5; Mont. Code

Ann. § 46-23-505(1).)

Menges must also provide notice if he wants to leave the county in which he

---

[3] Throughout this Order, the Court refers to the foregoing requirements collectively as "Montana's registration requirement."

is registered for longer than 10 days.  (Doc. 33 at 6; Mont. Code Ann. § 46-23-505(4).)  He must complete and submit an updated registration form annually.  (Doc. 33 at 6; Mont. Code Ann. § 46-23-504(6)(a)(iii).)   Any registration related costs are his financial burden to bear.  (Doc. 33 at 6; Mont. Code Ann. § 46-23-504(8).)  Failure to abide by any registration requirement is a felony.  (Doc. 33 at 6; Mont. Code Ann. § 46-23-507.)  These requirements are generally imposed for life.  Mont. Code Ann. § 46-23-506(1).

Montana's registration requirement has unsurprisingly had a negative impact on Menges' life.  He moved from Washington to Montana in March of 2020.  (*Id.* at 5.)  A few months later he was marked noncompliant in Montana's registration database and was consequently kicked out of two different homeless shelters.  (Doc. 9-2 at 3.)  Having nowhere else to go, Menges was forced to sleep on the street.  Menges inclusion on the registry has also cost him two different employment opportunities.[4]  (Doc. 9-2 at 3–4.)  In March 2021, Menges returned to Montana and established a residence in Butte.  (Doc. 33 at 5.)

---

[4] At the consolidated trial on the merits, Montana objected to Menges' testimony regarding the loss of one specific job opportunity on the grounds that they had not been afforded the chance to take his deposition and had not previously been made aware of this occurrence. The Court overruled the objection.  The testimony was relevant, and Montana leveled no objection to the consolidated trial on the merits.  Nonetheless, it is worth mentioning that while this fact is relevant, it is ultimately far from determinative with respect to the conclusions reached below.

## II.     Procedural Background.

Menges filed suit on December 9, 2020.  (*See generally* Doc. 1.)   He complains that Montana's registration requirement is unconstitutional, as applied to him, in violation of: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Equal Protection Clause of the Fourteenth Amendment; and (3) Article II, § 10 of the Montana Constitution.  (*Id.* at 9–12.)  Menges has also moved for a preliminary injunction, requesting that this Court enjoin the Defendants, "their officers, agents, employees, attorneys, and any person who in active concert or participation with them from requiring him to register as a sex offender with the Montana Sexual or Violent Offender Registry."  (Doc. 9.)

In response, Defendants moved to stay this matter in light of Menges' parallel Idaho federal court suit challenging, among other things, the Idaho statute that requires him to register on the basis of his 1994 conviction.  (Doc. 15.) Defendants have also moved to dismiss Menges' complaint for failure to state a claim.  (Doc. 24.)  This motion contends that Menges lacks standing and his claims are *Heck* barred.  (Doc. 25.)  The Court set a hearing on these three motions (Doc. 26) and provided advance notice of its intent to consolidate the hearing with a trial on the merits (Doc. 32.)  Neither party objected to the consolidation and the hearing commenced on March 30, 2021 during which Menges testified and the Court heard argument from counsel on the legal issues presented.  (Doc. 34.)

5

<u>**ANALYSIS**</u>

At this juncture, the case presents several distinct legal questions, which are addressed in the following order.  First, the Court will address the parties' arguments regarding standing and application of the *Heck* doctrine, both of which implicate subject matter jurisdiction to resolve the remaining issues.  After finding the Court has jurisdiction, the analysis proceeds, *sua sponte*, to the Eleventh Amendment issues posed by Menges' claims.  Finding no Eleventh Amendment barrier the Court next examines whether the matter should nonetheless be stayed.  Concluding it should not, Menges' claim for permanent injunctive relief is analyzed.  Ultimately, the Court finds that Menges' claims enjoy actual success on the merits and will accordingly grant him the remaining relief he requests and enter judgment in his favor.

## I.    Subject Matter Jurisdiction.

"It is a fundamental precept that federal courts are courts of limited jurisdiction."  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  This notion is derived from the United States Constitution itself, which limits the Court's subject matter jurisdiction to justiciable "cases" or "controversies."  U.S. Const., Art. III, § 2.  The federal courts' limited jurisdiction "is founded in concern about the proper—and properly limited—role of the courts in a democratic society."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (internal

citations omitted).

As such, it is incumbent upon this Court to ascertain whether subject matter jurisdiction exists before analyzing the merits of a litigant's claims. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Indeed, this Court is to presume it is without jurisdiction to hear a case until a contrary showing is made. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). In essence, subject matter jurisdiction is "the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). This includes underlying concepts such as standing, *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011), and common law limitations such as the *Heck* doctrine, *Lockett v. Ericson*, 656 F.3d 892, 895–96 (9th Cir. 2011). Each is discussed in turn below.

But first, the Court must address its ability to look outside the pleadings in resolving the questions of whether Menges has standing or his claims are *Heck* barred. Because, as noted above, both of these issues implicate this Court's subject matter jurisdiction, they are properly advanced through a Rule 12(b)(1) motion.[5] *See Id.* (*Heck*); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (standing). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone*

---

[5] Notably, Defendants couch their *Heck* argument under Rule 12(b)(6), but due to its subject matter jurisdiction implications, the Court addresses it under Rule 12(b)(1).

*v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial attack argues there is want of jurisdiction based on the allegations in the complaint alone.  *Id.*  A factual attack, however, relies "on extrinsic evidence and [does] not assert lack of subject matter jurisdiction solely on the basis of the pleadings."  *Id.* (internal citations and quotation marks omitted).

This distinction is critical, because Rule 12(b)(1) factual attacks, as opposed to Rule 12(b)(1) facial attacks, permit the Court to "look beyond the complaint . . . without having to convert the motion into one for summary judgment."  *Id.*; *see also White*, 227 F.3d at 1242.  In their motion to dismiss, the Defendants do not urge this Court to confine itself it to the allegations in Menges' complaint.  (Doc. 25 at 6.)  Indeed, the crux of the Defendants' argument is that Menges' claims cannot be redressed by a favorable decision and that if he were to prevail, such success "would necessarily imply the invalidity of his conviction" in violation of *Heck*.  (Doc. 25 at 5–9.)  Accordingly, the Court will construe Defendants' subject matter jurisdiction challenge as factual and look beyond the pleadings in addressing the standing and *Heck* issues presented by this case.[6]

---

[6] To the extent Defendants bring a direct 12(b)(6) challenge, which only becomes clear in their reply brief (Doc. 30 at 7–12), the Court finds separate analysis unnecessary because, as discussed at length below, Menges not only states a claim, he enjoys actual success on the merits.

## A. Standing.

"At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset" of the case. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). In order to establish standing, Plaintiffs must show "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

Critically, the threshold question of whether Menges' has standing "precedes, and does not require, analysis of the merits." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). Moreover, the "standing analysis which prevents a claim from being adjudicated for lack of jurisdiction, [cannot] be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true." *Catholic League for Religious and Civil Rights v. City and Cty. of S.F.*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc). Applying these principles, the Court finds Defendants' standing argument is without merit.

Defendants' standing argument focuses on the third element—

redressability—but the Court finds it prudent to address all three elements regardless. (Doc. 25 at 5–9.) In doing so, this Court pays particular attention to *Doe v. Jindal*, 851 F.Supp.2d 995, 1003–04 (D. La. 2012), where a plaintiff advancing a nearly identical challenge to that brought here was found to have standing.

Beginning with the first element—infliction of an injury in fact—Menges must establish that he has "suffered 'an invasion of a legally protected interest' that is 'concrete *and* particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (emphasis added). An injury is "concrete" when it "actually exist[s]," or stated differently, is "real, and not abstract." *Id.* at 1549 (internal quotation marks omitted). An injury is "particularized" when it "affect[s] the plaintiff in a personal and individual way." *Id.* at 1548.

The injuries of which Menges complains are both concrete (real) and particularized (personal). Specifically, the parties agree that by operation of Montana law, the State forces Menges to register as a sexual offender. As noted above, Montana imposes significant burdens on registrants, including annual registration fees, restraints on movement, notification obligations, and the specter of criminal process. *Jindal*, 851 F. Supp. 2d. at 1003. And those are just the injuries directly inflicted. Montana's registration requirement has also cost

10

Menges housing and jobs.  Not to mention the dissemination of personal

information and the public designation that he is a sexual offender.  The foregoing

is more than sufficient to constitute the sort of concrete and particularized injury

required to satisfy the first element in the standing analysis.

As to element two—traceability—Menges must establish that there is a

causal chain between the challenged conduct and the injury complained of.

*Juliana v. United States*, 947 F.3d 1159, 1169 (9th Cir. 2020).  He has clearly done

so.  There is agreement that the Defendants all have a role in the administration

and enforcement of Montana's registration requirement.  (Doc. 33 at 7.)  As in

*Jindal*, this "places the defendants among those who contribute to [Menges']

harm."  851 F. Supp. 2d at 1004.  In short, element two is satisfied because there is

traceability between the conduct complained of and the Defendants' actions.

To satisfy the third element—redressability—Menges must establish that the

relief he requests is "both (1) substantially likely to redress [his] injuries; and (2)

within the district court's power to award."  *Juliana*, 947 F.3d at 1170 (citing *M.S.*

*v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)).  This burden is "relatively

modest," *M.S.*, 902 F.3d at 1083, and in the context of constitutional challenges,

the Court assumes the underlying claim has merit.  *Bonnichsen v. United States*,

367 F.3d 864, 873 (9th Cir. 2004).

As enumerated in his complaint, Menges' seeks various forms of relief,

11

including:

    i.     Declaring that his inclusion in Montana's Sexual or Violent Offender Registry for a 1994 conviction under Idaho Code § 18-6605 is unconstitutional;

    ii.    Declaring that Montana's registration requirement is unconstitutional as-applied to himself and anyone with a pre-*Lawrence* conviction for any statute in which engaging in oral or anal sex was the sole element;

    iii.   Declaring that Defendants' actions violate his rights under the Fourteenth Amendment to the United States Constitution;

    iv.   Declaring that Defendants' actions violate his rights under Article II, Section 10 of the Montana Constitution;

    v.    Permanently enjoining Defendants from requiring him to register as a sexual offender for his prior conviction under Idaho's Crime Against Nature statute, Idaho Code § 18-6605;

    vi.   Ordering Defendants to permanently remove Plaintiff from Montana's Sexual or Violent Offender Registry;

    vii.   Ordering Defendants to expunge all state records indicating that Plaintiff was ever subject to registration on Montana's Sexual or Violent Offender Registry; and

    viii.   Ordering Defendants to alert all agencies who were provided information about his registration (including courts, police departments, sheriff's departments, and the Federal Bureau of Investigation) that this information is no longer valid.

(Doc. 1 at 12–13.)  Defendants argue Menges' claims are non-redressable, because

a favorable decision would not "cure the injury of which [Menges] complains."

(Doc. 25 at 7–8.)  The Court disagrees.

      To the extent Defendants' redressability argument rests on the fact that

Menges left Montana, any force it carried evaporated with his return.  (Doc. 33 at 5.)  Defendants' only remaining argument appears to be centered around the conclusory proposition that only a favorable ruling from an Idaho federal court would redress his injury.  The Court disagrees.  In this action, Menges complains that his constitutional rights are violated through the sexual offender registration requirement imposed by *Montana law*.  If successful, enjoining enforcement of Montana's registration requirement will absolve Menges of his obligation to register as a sexual offender under Montana law.

Such relief would specifically redress the injuries of which he complains. And those injuries stem directly from Montana's registration requirement.  In other words, the redressability element is satisfied because "if the Court were to rule in [Menges'] favor" he "would no longer be burdened with complying with the sex offender registration requirements."  *Jindal*, 851 F. Supp. 2d at 1004.  And the Court finds it can properly afford Menges such redress, as declaring a law unconstitutional and enjoining its enforcement is a core and well-established judicial function.  *See Lawrence v. Texas*, 539 U.S. 558 (2003); *Ex Parte Young*, 209 U.S. 123 (1908).  In short, Menges has standing.  The Court next addresses whether his claims are nonetheless barred by *Heck*.

### B.    The *Heck* Doctrine.

Defendants maintain Menges' claims[7] are barred by the rule established in

*Heck v. Humphrey*, 512 U.S. 477 (1994).  While prior precedent lacks a clear

answer, s*ee Doe v. Hood*, 345 F. Supp. 3d 749, 754–56 (S.D. Miss. 2018), the

Court ultimately concludes that success for Menges in this action would not

necessarily invalidate his underlying Idaho conviction.  Accordingly, the *Heck* bar

is inapplicable and Menges' claims may proceed.

Any thorough discussion of *Heck* must begin not with *Heck*, but with its

predecessor case, *Preiser v. Rodriguez*, 411 U.S. 475 (1973).  In *Presier*, several

state prisoners filed suit under § 1983 alleging that prison officials had

unconstitutionally deprived them of good-time credits.  411 U.S. at 477.  The

prisoners sought an injunction restoring the good-time credits, which would have

resulted "in their immediate release from confinement in prison."  *Id.*

The Supreme Court held that the prisoners' § 1983 actions were barred,

because their claims "fell squarely within this traditional scope of habeas corpus"

by attacking the duration or fact of their confinement.  *Id.* at 487–88.  It went on to

explain its holding as follows, "when a state prisoner is challenging the very fact or

---

[7] Although *Heck* and most subsequent cases have involved § 1983 claims, the principles
derived from those cases have been applied to other causes of action advanced outside the habeas
process.  *See, e.g., Erlin v. United States*, 364 F.3d 1127, 1131 (9th Cir. 2004) (Federal Tort
Claims Act).  Because the Court concludes that *Heck* does not apply in this case, it need not
examine whether the rule from *Heck* operates to bar Menges' third claim, a standalone claim
under the Montana Constitution.

duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500.

The Supreme Court expanded on *Preiser* just a year later in *Wolff v. McDonnell*, 418 U.S. 539 (1974).  In *Wolff*, a class of state prisoners sued prison officials under § 1983 complaining about the allegedly unconstitutional procedures by which good-time credits were calculated.  *Id.* at 543.  As relief, the prisoners sought: (1) the sort of retrospective injunctive relief foreclosed by *Preiser*; (2) prospective injunctive relief aimed at preventing future unconstitutional deprivation of good-time credits; and (3) "damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures." *Id.* at 553.

Discarding the first form of relief as explicitly barred in *Preiser*, the Supreme Court held that the prisoners' second and third forms of relief remained cognizable through § 1983.  *Id.* at 554–55.  The Court explained that *Preiser* only barred "an injunction restoring good time improperly taken," not a prisoner's damages claim regarding the procedures employed in calculating good-time credits or "ancillary relief" in the form of "an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations." *Id.*  The critical fact being that even if a court afforded a prisoner such relief, it would not "call into question

15

the lawfulness of the plaintiff's continuing confinement" because relief stemming from the use of "wrong procedures" would not "vitiate[] the denial of good-time credits." *Heck*, 512 U.S. at 482–83 (clarifying the precise holding in *Wolff*).

The Supreme Court next substantially expanded on its rule from *Preiser* in *Heck*. There, a state prisoner filed suit under § 1983 against state officials seeking monetary damages for their allegedly unconstitutional actions in obtaining his conviction. *Id.* at 478–79. Because the damages sought would necessarily "call into question the lawfulness of conviction or confinement," the case presented the same issue as "*Preiser:* whether the claim is cognizable under § 1983 at all." *Id.* at 483. In resolving this question, the Supreme Court imposed a so-called favorable termination requirement, stating:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 486–87 (emphasis original).

16

In so holding, however, the Supreme Court was clear that "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* at 487 (emphasis original).  Accordingly, *Heck* instructs this Court to scrutinize whether success would *actually* invalidate an underlying conviction, including application of other doctrines such as independent source, inevitable discovery, and "especially harmless error," which may ultimately preclude invalidation, even in the face of a blatant constitutional violation.  *Id.* at 487, n.7.

The Supreme Court applied *Heck* three years later in *Edwards v. Balisok*, 520 U.S. 641 (1997).  In *Balisok*, a state prisoner sued under § 1983 seeking damages and declaratory relief for the use of allegedly unconstitutional procedures "to deprive him of good-time credits." *Id.* at 643.  Because his claims for retrospective declaratory relief and damages were "based on allegations of deceit and bias on the part of the decisionmaker," the Supreme Court concluded that the issuance of such relief would "necessarily imply the invalidity of the punishment imposed" and was therefore not cognizable under § 1983.  *Id.* at 648.  The Supreme Court did speculate that a claim for prospective relief would be cognizable, because it would "not necessarily imply the invalidity of a previous loss of good-time credits," but left this issue for the lower courts to sort out on

17

remand.  *Id.*

Nearly a decade later, the Supreme Court summarized the foregoing holdings in *Wilkinson v. Dotson*, 544 U.S. 74 (2005).  The Court explained that "[t]hroughout the legal journey from *Preiser* to *Balisok*, the Court has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody."  *Id.* at 81–82.  Consequently, the Court held that "[t]hese cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration."  *Id.*

The Court begins its analysis by pointing out that all of the critical Supreme Court precedent on the application of *Heck*, from *Preiser* to *Balisok* occurred in a context where a *currently in-custody prisoner* initiates suit under § 1983.  Nobody disputes Menges has fully discharged the lengthy sentence imposed by Idaho for his 1994 conviction.  He is no longer "in-custody," and, consequently, cannot avail himself to the habeas process as the *Heck* line of cases demands.  *Williamson v.*

18

*Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998).  Accordingly, it is tempting to reject application of *Heck*'s bar to Menges' suit on this basis alone.

Indeed, in *Dotson*, the Supreme Court was abundantly clear that *Heck* exists to prevent currently "in-custody" individuals from circumventing the habeas process by way of § 1983.  *Id.* at 81–84 (repeatedly emphasizing *Heck*'s application to § 1983 actions brought by *prisoners*, not persons no longer in custody).  The inapplicability of *Heck* to Menges' situation is further supported by the fact that in *Spencer v. Kemna*, 523 U.S. 1 (1998), five justices embraced, albeit indirectly, the proposition that when a prisoner is released from custody, habeas is no longer pursuable, and, accordingly, *Heck* is of no value and other civil causes of action such as § 1983 must be available.  *Ramirez v. Galaza*, 334 F.3d 850, 859 n.7 (9th Cir. 2003); *see also Nonnette v. Small*, 316 F.3d 872, 875–78 (9th Cir. 2002).

But because the Supreme Court has never formally adopted this position in a majority opinion, *Muhammad v. Close*, 540 U.S. 749, 752, n.2 (2004), the Ninth Circuit, as with many other circuits, has forged its own path.  The result is a fact-intensive line of cases in which the Ninth Circuit has construed (or not construed) *Heck* to bar civil causes of action by individuals even when they are indisputably no longer "in-custody" for habeas purposes or are otherwise unable to avail themselves to the habeas process.  *Compare Nonnette v. Small*, 316 F.3d 872, 875–78 (9th Cir. 2002) to *Cunningham v. Gates*, 312 F.3d 1148, 1153 n. 3 (9th Cir.

19

2002), *Guerrero v. Gates*, 442 F.3d 697, 703–05 (9th Cir. 2006) and *Lyall v. City of L.A.*, 807 F.3d 1178, 1190–92 (9th Cir. 2015).  In the Court's view, application of *Heck* to such situations, which effectively box such litigants' claims out of the civil arena altogether, is a far cry from the Supreme Court's original concerns over *currently incarcerated prisoners* circumventing habeas by way of § 1983.

Despite this Court's serious threshold concerns about *Heck*'s application to the circumstances present in this case, where Menges is no longer in custody and cannot possibly avail himself to the habeas process, it has no choice but to "salute smartly and follow precedent" established up above.  *Byrd v. Lamb*, 990 F.3d 879 (5th Cir. 2021) (J., Willett, concurring).   Ultimately, the Court need not wrestle with this authority today, because it finds that the decisive *Heck* trigger—that success in Menges' § 1983 suit will necessarily invalidate his Idaho conviction—is not present in this case.  As such, *Heck* is inapplicable.

In this case, a finding that Montana's registration requirement is unconstitutional as applied to Menges, would have no effect (necessarily or otherwise) on his underlying Idaho conviction.  Indeed, as Menges himself points out, Idaho's prosecution of him for engaging in homosexual activity was indisputably lawful at the time it occurred.  The Supreme Court's ruling in *Bowers v. Hardwick*, 478 U.S. 186 (1986), upholding the constitutionality of statutes such as the one used to prosecute Menges, was in full force and effect at the time he was

convicted in 1994.

Menges does not raise a direct attack on his underlying conviction.  On the contrary, the crux of his claims are that it is unconstitutional for Montana to force him to register as a sexual offender *today* for engaging in constitutionally protected conduct.  The validity of his underlying conviction in light of subsequent judicial rulings such as *Lawrence*, presents distinct legal issues, such as retroactivity, not present in this case nor necessarily resolved in Menges' favor by virtue of a victory in this lawsuit.  The foregoing pulls this lawsuit far from the "core of habeas corpus" of which the *Heck* line of cases is ultimately concerned.  *Wilkinson*, 544 U.S. at 82; *see also Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (noting *Heck* has never operated to bar a plaintiff's claim when "the relief sought would neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody"); *Cunningham*, 312 F.3d at 1153–54 (describing *Heck's* critical inquiry as "whether a § 1983 plaintiff could prevail only by negating 'an element of the offense of which he has been convicted'").

Additionally, even assuming success in this lawsuit did cast a shadow of doubt on Menges' underlying conviction, *Heck* would not apply because "a separate action—alleging a separate constitutional violation altogether—would be required to overturn his conviction."  *Osborne v. District Attorney's Office for Third Judicial District*, 423 F.3d 1050, 1054–55 (9th Cir. 2005).  Moreover, the

fact that a favorable ruling in this case may very well set the stage for a collateral attack on Menges' Idaho conviction is of no consequence, because *Heck* does not reach so far. *Switzer*, 562 U.S. at 534 (concluding a claim is not *Heck* barred simply because its "*ultimate* aim" may be to serve as a springboard "for attacking [the plaintiff's underlying] conviction").

In sum, *Heck* is inapplicable because success for Menges in this action will not necessarily invalidate his underlying conviction. Accordingly, the Court need not resolve issues raised by the parties regarding application of *Heck* to Menges when he is no longer in custody and the distinction between *Heck*'s application to prospective as opposed to retrospective relief. Having resolved the *Heck* issue, the Court turns its attention to whether Menges' claims are barred by the Eleventh Amendment.

## II.    The Eleventh Amendment.

Even when not explicitly raised by the parties, this Court has an independent obligation to "examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). The jurisdictional description is a bit of a misnomer, however, and the Eleventh Amendment is generally understood today to operate as an affirmative defense rather than an outright jurisdictional bar. *Tritchler v. County of Lake*, 358 F.3d 1150, 1153–54 (9th Cir. 2004); *see also*

22

*Wagnon v. Rocklin Unified Sch. Dist.*, 2021 WL 1214571, *2 (E.D. Cal. 2021);

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (noting that

jurisdiction "is a word of many, too many, meanings").  Accordingly, the Court

addresses the Eleventh Amendment issues separately from the subject matter

jurisdiction issues described above.[8]

While there are certainly Eleventh Amendment issues raised by Menges

complaint, the Court ultimately concludes this defense poses no barrier to the

adjudication of this action.  One who examines the text of the Eleventh

Amendment for meaning will be sorely disappointed.  Indeed, as this Court

recently observed, the Eleventh Amendment stands "not so much for what it says,

but for the presupposition it confirms, namely, that a state is not amenable to the

suit of an individual without its consent."  *Donald J. Trump for President, Inc. v.*

*Bullock*, 491 F. Supp. 3d 814, 825 (D. Mont. 2020) (citing *Seminole Tribe of Fla.*

*v. Florida*, 517 U.S. 44, 54 (1996)).  Suits against a state, generally include suits,

such as the one brought here, against state officials in their official capacities.

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

Menges has sued various Montana officials in their official capacities,

---

[8] It is additionally appropriate to address Eleventh Amendment issues at this juncture, because, like the subject matter jurisdiction issues addressed above, such an inquiry precedes rather than "include[s] an analysis of the merits" of a litigant's claims. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).

complaining that their enforcement of Montana's registration requirement violates

his rights under the United States and Montana Constitutions.  (*See generally* Doc.

1).  Accordingly, there are several possible Eleventh Amendment issues in play,

depending on the nature of each claim and the relief Menges seeks if successful.

Recall, as to his three claims Menges seeks the following forms of relief:

i.    Declaring that his inclusion in Montana's Sexual or Violent
      Offender Registry for a 1994 conviction under Idaho Code §
      18-6605 is unconstitutional;

ii.   Declaring that Montana's registration requirement is
      unconstitutional as-applied to himself and anyone with a pre-
      *Lawrence* conviction for any statute in which engaging in oral
      or anal sex was the sole element;

iii.  Declaring that Defendants' actions violate his rights under the
      Fourteenth Amendment to the United States Constitution;

iv.   Declaring that Defendants' actions violate his rights under
      Article II, Section10 of the Montana Constitution;

v.    Permanently enjoining Defendants from requiring him to
      register as a sexual offender for his prior conviction under
      Idaho's Crime Against Nature statute, Idaho Code § 18-6605;

vi.   Ordering Defendants to permanently remove Plaintiff from
      Montana's Sexual or Violent Offender Registry;

vii.  Ordering Defendants to expunge all state records indicating that
      Plaintiff was ever subject to registration on Montana's Sexual
      or Violent Offender Registry; and

viii. Ordering Defendants to alert all agencies who were provided
      information about his registration (including courts, police
      departments, sheriff's departments, and the Federal Bureau of
      Investigation) that this information is no longer valid.

24

(Doc. 1 at 12–13.)  For purposes of Eleventh Amendment analysis, the Court can

split these requests for relief into three categories: (1) permanent injunctive relief

(v); (2) declaratory relief (i–iv); and (3) ancillary relief (vi–viii).

   To the extent Menges seeks prospective permanent injunctive and

declaratory relief in response to federal constitutional violations, such claims fall

within a well-established exception to the Eleventh Amendment's protections.

Long ago, the Supreme Court held that the Eleventh Amendment does not bar suits

against state officials, seeking prospective enjoinment of their ongoing violation of

federal law.  *Ex parte Young*, 209 U.S. 123, 159–60 (1908); *Pennhurst*, 465 U.S. at

102.  The *Young* exception also encompasses claims for prospective declaratory

relief.  *L.A. Cty Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)*; Krainski v.

Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 967–68 (9th Cir. 2010) (concluding

that "Eleventh Amendment immunity" does not extend to suits against state

officials "where the relief sought is prospective in nature and is based on an

ongoing violation of the plaintiff's *federal* constitutional or statutory rights")

(emphasis original).

   Menges' federal constitutional claims and his corresponding claim for

prospective injunctive and declaratory relief, falls squarely within the *Young*

exception.  These claims complain of violations of the Fourteenth Amendment and

seek as relief a prospective injunction barring its future enforcement and

prospective declaratory relief that any future enforcement would be unconstitutional. Under *Young*, the Eleventh Amendment does not prohibit adjudication of these claims.

With respect to Menges' claim under the Montana Constitution, the Eleventh Amendment creates more significant problems. This is because the Eleventh Amendment bars claims where a plaintiff seeks prospective injunctive relief enjoining a state official's violation of *state law*. *Pennhurst,* 465 U.S. at 105–06, 121. In other words, under *Pennhurst*, claims requesting that a federal court enjoin a state official's actions on the basis of a Montana Constitutional violation, are barred by the Eleventh Amendment absent a waiver of sovereign immunity. *Rios-Diaz v. Butler*, 2014 WL 12591682, *3–4 (D. Mont. 2014). Critically, however, the Court finds that such a waiver has occurred here.

While a wavier must be "unequivocally expressed," *Pennhurst*, 465 U.S. at 99, it can be accomplished by a State's active litigation of a case on the merits without ever asserting the defense." *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 763 (9th Cir. 1999) (finding wavier where a State agency "unequivocally consented to the jurisdiction of the federal court by its conduct in appearing and actively litigating this case on the merits, while waiting until the opening day of trial to first assert immunity under the Eleventh Amendment"); *but see Doe v. Regents of the Univ. of Calif.*, 891 F.3d 1147, 1152–53 (9th Cir. 2018) (concluding

26

that a State's omission of the defense in its first motion to dismiss was insufficient to constitute a waiver when included in subsequent motion to dismiss). This is precisely the case here.

Defendants have submitted a significant number of filings over the life of this case, without a single mention of the Eleventh Amendment, let alone affirmatively invoking it as a defense. (Docs. 10–12; 15–18; 21; 24–25; 28; 30.) These filings include expansive argument on the propriety of Menges' claims. (Docs. 16; 17; 25; 28; 30.) In other words, Defendants did not raise an Eleventh Amendment defense before, during, or after the consolidated trial on the merits. Under these circumstances, the Court concludes that Montana has waived any Eleventh Amendment sovereign immunity defense it might have had to Menges' Montana constitutional claim.[9]

## III.    Entry of A Stay.

Defendants urge this Court to stay the matter in light of the parallel litigation filed by Menges in the United States District Court for the District of Idaho

---

[9] This holding also applies to any equitable relief sought by Menges that is properly characterized as retrospective rather than prospective, although the Court does not mean to say he seeks such relief here. As noted above, the line between proper and improper *Young* relief depends on whether the relief is "properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). But the "difference between retroactive and prospective relief will not in many instances be that between day and night." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). Because this issue is rendered immaterial by virtue of the State's wavier, the Court declines to wade into that muddled territory and is instead able to issue prospective and retrospective relief premised under either the United States or Montana Constitution.

challenging an Idaho statute that similarly requires him to register.  (Doc. 16 at 5–8.)  Under their theory, a ruling in that case as to the validity of Idaho's registration requirement has the potential to impact this lawsuit.  (*Id.*)  Menges predictably disagrees.  (Doc. 22.)  Ultimately, the Court finds a stay of this matter improper.

This Court enjoys broad discretion in determining whether the circumstances of a particular case justifies a stay.  *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997).  In exercising such discretion, however, this Court must weigh "the competing interests which will be affected by the granting or refusal to grant a stay."  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005).  These interests include: (1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer in being required to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.  *Id.*

Prior cases establish that when "there is even a fair possibility" that a stay will inflict harm on someone else, as is the case for Menges here, the party requesting a stay "must make out a clear case of hardship or inequity."  *Id.* at 1112.  This includes cases where a stay would delay the issuance of injunctive relief aimed at enjoining unlawful conduct.  *Id.*  Importantly, it is beyond doubt that "being required to defend a suit, without more, does not constitute a 'clear case of

28

hardship or inequity.'" *Id.*  In this case, the Defendants have not come close to meeting their burden.

Before addressing the interests at stake in this case, an examination of the parallel Idaho litigation is in order.  Undoubtedly, the Idaho lawsuit bears a striking resemblance to this lawsuit.  There, Menges challenges the constitutionality of the Idaho statute obligating him to register as a sexual offender because of his 1994 conviction on due process and equal protection grounds.  (Doc. 16-1 at 20–28.) But there are also significant differences between Menges' Idaho case and this one.

For one, in the Idaho case Menges brings a direct challenge to the constitutionality of the Crimes Against Nature statute, Idaho Code § 18-6605, under which he was convicted in 1994.  (*Id.* at 22–26.)  Such a challenge is not present in this case and rests on Fourteenth Amendment vagueness grounds not raised here.  Additionally, as relief, Menges seeks to enjoin enforcement of Idaho's Crimes Against Nature statute altogether, requesting that the Court "enjoin[] Defendants from enforcing Idaho Code § 18-6605 in any situation involving activity between human beings."  (*Id.* at 29.)  Menges does not seek any comparable relief in this case.

There are also significant procedural differences between this case and the one currently pending in Idaho.  This Court has already held a trial on the merits and the parties await a final judgment.  (Doc. 34.)  While the District of Idaho is

certainly diligently adjudicating Menges' case, at this juncture the case has not moved beyond adjudication of pre-trial motions. Additionally, the parties have raised mootness issues in that case not present in this litigation. The foregoing differences weigh significantly in favor of letting this matter proceed.

The Court also notes that the focal point of Defendants' argument in favor of a stay—that resolution of the Idaho litigation will have an impact on this suit—is far from certain. Any ruling from the court presiding over the Idaho litigation would have little more than persuasive effect. If the court concludes that the Idaho statute obligating Menges to register as a sexual offender is constitutional, this Court is not precluded from reaching an opposite conclusion on Montana's registration requirement, and the Defendants need not alter their enforcement of Montana law in response. This alone undermines the practical effect of imposing a stay.

The foregoing conclusion is compounded by the fact that imposing a stay in this matter would occasion significant hardship on Menges. As has been stated at length throughout, this lawsuit is aimed at enjoining the enforcement of an allegedly unconstitutional law. If Menges is correct, then delaying the issuance of an injunction until a ruling in the Idaho lawsuit would inflict the sort of unnecessary injury that concerned the Ninth Circuit in *Lockyer*. *Id.* at 1112. Moreover, given the different procedural postures of the two lawsuits, there is

nothing in the record indicating "the [Idaho] proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Id.* at 1111. In other words, this factor weighs strongly in favor of declining to enter a stay.

In sharp contrast to the hardship imposed on Menges by the issuance of a stay, the Court is unpersuaded any comparable level of harm would be occasioned on Defendants should they be forced to proceed with this lawsuit. Indeed, Defendants do not contend that any kind of harm would befall them without a stay, except perhaps an unnecessary expenditure of scarce judicial resources. But this is precisely the sort of "being required to defend a suit" argument explicitly rejected by the Ninth Circuit as a sufficient reason to enter a stay. *Id.* at 1112. This factor adds little, if any, support for issuance of a stay in this case.

The final factor—the orderly course of justice—also weighs against the entry of a stay in this matter. As noted above, a ruling in the Idaho litigation will have no conclusive effect on the outcome of this dispute and the two cases share significant differences. As such, the orderly course of justice demands that this matter proceed.

After examining the circumstances of this case, the Court finds a stay of this matter pending a ruling from the District of Idaho inappropriate. Such a stay would possibly occasion serious injury on Menges while proceeding would not

31

impact Defendants in any meaningful way.  Additionally, the orderly course of justice mandates moving forward, not standing by.  Having resolved all preliminary issues, the Court turns its attention to the merits.

### IV.  Injunctive Relief.

Although Menges seeks various forms of relief, his request for permanent injunctive relief is the natural starting point because it depends on his actual success on the merits.  Accordingly, the propriety of the other forms of relief Menges seeks, such as declaratory or other ancillary relief, rises and falls with his request for permanent injunctive relief.

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  In adjudicating requests for injunctive relief, this Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*  In doing so, it is imperative that this Court "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*  This is especially true when injunctive relief is sought against governmental actors because "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Rizzo v. Goode*, 423 U.S. 362, 378 (1976).

To obtain the injunctive relief he seeks, Menges must demonstrate: (1) actual success on the merits; (2) that he has suffered an irreparable injury; (3) there exists no adequate remedy at law; (4) the balance of the hardships justifies a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction. *Independent Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v. MerchExch., LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the final two factors merge into one. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

In applying these elements, the Court is mindful that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction" and that cases interpreting the preliminary injunction standard apply "with equal force to . . . permanent injunction cases." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (internal citations omitted). Upon considering the foregoing, the Court finds that Menges has carried his burden and will afford him the permanent injunctive relief he seeks.

## A.    Actual Success on the Merits.

As noted above, Menges advances three claims, alleging that Montana's registration requirement violates: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Equal Protection Clause of the Fourteenth Amendment; and

(3) Article II, § 10 of the Montana Constitution.  (Doc. 1 at 9–12.)  Each claim is discussed in turn.

### i.      Due Process Claim.

Menges argues that Montana's registration requirement infringes on his constitutional right to substantive due process.  The Fourteenth Amendment forbids Montana from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  It is undisputed this clause has both a procedural and substantive component.  *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998).  Only the latter is at issue in this case.  (Doc. 31.)

The Due Process Clause's substantive component "provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  Obviously, the "most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights," but the Supreme Court has "never accepted [the] view" that the Due Process Clause's substantive reach ends there.  *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992).

Instead, over time, the Supreme Court has held that the substantive component of the Due Process Clause protects, among other things, the unenumerated right to marry a person of a different race or of the same-sex, to

34

have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *Glucksberg*, 521 U.S. at 720; *Obergefell v. Hodges*, 576 U.S. 644, 680–81 (2015). Relevant to this case, such protected liberties often encompass "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663.

Although not always explicitly delineated, the proper resolution of a substantive Due Process Clause claim requires the undertaking of two separate inquiries. The first inquiry asks whether the State is depriving the complaining individual of a "liberty interest" protected by the substantive component of the Due Process Clause. *Glucksberg*, 521 U.S. at 720–728 (ascertaining whether the "right to die" is a protected liberty interest under the Fourteenth Amendment). If not, the inquiry ends. *See Nunez v. City of L.A.*, 147 F.3d 867, 873–74 (9th Cir. 1998) (ending a substantive due process inquiry upon concluding that no deprivation of a cognizable liberty interest had occurred). If so, the Court moves to the second inquiry. *Glucksberg*, 521 U.S. at 728.

The second inquiry requires this Court to apply the appropriate level of scrutiny to ascertain whether the state action amounts to a substantive due process violation. *Id.* at 728 (concluding that while the right to die is not a fundamental right, it is a protected liberty interest for which the State's interference must

35

survive rational basis review"); *see also Witt v. Department of Air Force*, 527 F.3d 806, 816–18 (9th Cir. 2008).  The Court will undertake each inquiry in turn and notes at the outset that while the Due Process Clause and the rights of gay individuals share a tortured past, the arc of the jurisprudence in this area bends in Menges' favor.

### 1.    Deprivation of Protected Liberty Interest.

Turning to the first inquiry—the deprivation of liberty interest protected by the Due Process Clause—the Court begins with *Bowers*.  In *Bowers*, the Supreme Court addressed the constitutionally of a Georgia statute which proscribed "any sexual act involving the sex organs of one person and the mouth or anus of another."  478 U.S. at 188 n.1.  The Supreme Court framed the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy" before concluding it did not.  *Id.* at 190.  In reaching its conclusion, the Supreme Court concluded that such a right would be neither "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition."  *Id.* at 191–92.  Accordingly, it rejected Hardwick's substantive due process challenge and upheld the constitutionality of Georgia's anti-sodomy statute.  *Id.* at 196.

The Supreme Court completely reversed course in 2003 when it decided *Lawrence*.  There, the Supreme Court addressed "the validity of a Texas statute

making it a crime for two persons of the same sex to engage in certain intimate sexual conduct." *Lawrence*, 539 U.S. at 562. The Supreme Court rested its decision on substantive due process grounds, concluding that the statute at issue "seek[s] to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Id.* at 567.

Revisiting *Bowers*, the Supreme Court made clear the case "was not correct when it was decided, and it is not correct today" before formerly overruling it. *Id.* at 578. Justice Kennedy writing for the majority, stated "When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make that choice." *Id.* at 567. Recognizing that, of course, "for centuries there have been powerful voices to condemn homosexual conduct as immoral," the Supreme Court was clear that as a matter of substantive due process, the true question is whether such voices "may use the power of the State to enforce these views on the whole of society through the operation of criminal law." *Id.* at 571. Under *Lawrence*, they cannot.

Noting that the case involves "two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle," the Supreme Court explained that substantive due process forbids the State from

"demean[ing] their existence or control[ling] their destiny by making their private sexual conduct a crime." *Id.* at 578.  Put another way, as the Supreme Court explained, the "right to liberty under the Due Process Clause" provides gay individuals with the right to engage in intimate sexual contact "without intervention of the government." *Id.*  Because the Texas statute at issue implicated the exercise of this liberty interest and "further[ed] no legitimate state interest," it ran afoul of the Fourteenth Amendment's substantive due process component. *Id.*

The question becomes whether the right identified in *Lawrence* is implicated by Montana's registration requirement in this case. *Id.* at 819.  To be sure, the Supreme Court in *Lawrence* was less then precise in delineating exactly what liberty interests were at issue.  Taken at face value, *Lawrence* can be read for the principle that the Fourteenth Amendment protects an individual's right to engage in consensual intimate sexual contact with a person of the same sex.  539 U.S. at 578.  Indeed, less than a year after *Lawrence* was decided, the Ninth Circuit read that opinion to hold "that the Due Process Clause of the Fourteenth Amendment protects the right of two individuals to engage in fully and mutually consensual private sexual conduct." *Anderson v. Morrow*, 371 F.3d 1027, 1032–33 (9th Cir. 2004).

Both the Ninth Circuit and the Supreme Court have never construed the right at issue in *Lawrence* in a narrower fashion.  On the contrary, in 2005, the Ninth

Circuit read *Lawrence* broadly for the proposition that the Fourteenth Amendment "encompasses a right of sexual intimacy." *Fields v. Palmdale School Dist.*, 427 F.3d 1197, 1208 (9th Cir. 2005). Any doubt about the scope of the right identified in *Lawrence* was clarified in *Obergefell*, where the Supreme Court explained that *Lawrence* established "same-sex couples have the same right as opposite-sex couples to enjoy intimate association." 576 U.S. at 667. With this in mind, the Court turns to the question of whether Montana's registration requirement implicates the right identified in *Lawrence*, when applied to Menges in this case.

Menges argues that Montana's registration requirement forces him to register as a sexual offender for engaging in the very sort of conduct found to be constitutionally protected in *Lawrence* (i.e. having consensual anal or oral sex with another male). (Doc. 9-1 at 19.) In this way, he argues he is being deprived of a liberty interest in violation of the substantive due process clause of the Fourteenth Amendment. (*Id.*) Montana's only contrary argument appears to be that Montana does not require Menges to register as a sexual offender because of the underlying conduct forming the basis of his 1994 conviction, but rather because of the underlying conviction itself. (Doc. 25 at 11.) The Court is unpersuaded by this contention.

To be sure, the most direct answer to the question of why Menges must register as a sexual offender under Montana law, is because he was convicted of a

crime in Idaho that requires him to register in that state. But constitutional violations require this Court to dig deeper. Upon doing so, it becomes clear that Montana requires Menges to register as a sexual offender because in 1993 he was convicted of a crime under Idaho's Crimes Against Nature statute. Going one step further, it is apparent that Montana requires Menges to register as a sexual offender because he had intimate sexual contact with a person of the same sex. This is where the deprivation of a liberty interest arises, because this is precisely the sort of conduct found to be constitutionally protected in *Lawrence*.

Under Montana's view, the State would be free to impose adverse legal consequences on Menges for engaging in constitutionally protected conduct (i.e. without implicating any protected liberty interest) so long as it does so *indirectly* by operation of a carefully drafted multi-layered statute. This would be an odd constitutional principle. The Court is unconvinced that Montana's registration requirement does not implicate the sort of liberty interest identified in *Lawrence*, simply because it operates in conjunction with, or through incorporation of, another state's statute.

The Court recognizes that in *Lawrence*, the Supreme Court was primarily concerned with deprivations of the right at issue by operation of criminal law. *Lawrence*, 539 U.S. at 571. But in *Obergefell*, the Court was clear the liberty interest at issue in *Lawrence* must be insulated from deprivation by other, more

indirect or ancillary forms of state action.  576 U.S. at 667 (holding "while *Lawrence* confirmed a dimension of freedom that allows individuals to engage in intimate association without criminal liability, it does not follow that freedom stops there.  Outlaw to outcast may be a step forward, but it does not achieve the full promise of liberty").  Accordingly, Montana's imposition of a sexual offender registration requirement on Menges, and all that comes with it, by virtue of his engagement in intimate sexual contact with a person of the same sex is sufficient to implicate the guarantee of substantive due process as defined in *Lawrence*.

As a final matter, the Court also finds it prudent to recognize that this case involves minors, something notably absent in *Lawrence*.[10]  Without a doubt, in *Lawrence*, the Supreme Court emphasized that "[t]he present case does not involve minors."  539 U.S. at 578.  But the underlying Idaho statute, which forms the basis of his conviction, does not concern itself with the age of any sexual partners.  Idaho Code §§ 18-6605–6606.  Instead, the focal point of the statute is whether the defendant engaged in oral or anal sex.  *Id.*

Because the underlying criminal statute which obligates Menges to register in Idaho, and, accordingly in Montana, does not concern itself with the age of

---

[10] The Court notes that Menges was 18 years old when he engaged in intimate sexual contact with two 16-year-old males.  The record reveals the sexual contact, by all accounts, was consensual (Doc. 9-6 at 2, 7–8.)  Moreover, neither Montana nor Idaho considers such conduct to constitute statutory rape. Idaho Code § 18-6101(1)–(2); Mont. Code Ann. § 45-5-501(1)(b)(iv).

Menges' sexual partner, the Court need concern itself with that issue here. *See MacDonald v. Moose*, 710 F,3d 154, 164–66 (4th Cir. 2013). Put another way, Menges' underlying criminal conviction is not for having sexual contact with a minor, it is for having sexual contact with another male. And that is why Montana requires him to register—not for having sexual contact with a minor, but for having sexual contact with another male. In this way, the right at issue in *Lawrence* applies with equal force, without regard to the presence of minors. Having concluded that Montana's registration requirement intrudes upon the liberty interest discussed in *Lawrence*, the Court next addresses whether the governmental action can survive the applicable level of scrutiny.

### 2.     Applying the Applicable of Standard of Review.

As other federal courts have recognized, the standard of review applied by the Supreme Court in *Lawrence* is unclear. *Witt*, 527 F.3d at 814; *see also Lofton v. Secretary of Dept. of Children and Family Servs.*, 358 F.3d 804, 817 (10th Cir. 2004). The Court need not opine on the issue in this case because in the Ninth Circuit the question is well settled. In *Witt*, the Ninth Circuit concluded that "*Lawrence* applied something more than traditional rational basis review," but something less than strict scrutiny under which "[f]ew laws survive." *Id.* at 817. Instead, *Witt* instructs this Court to apply a sort of "heightened scrutiny," by which the Court addresses three factors. *Id.* at 818–19 (citing *Sell v. United States*, 539 U.S. 166,180–

81 (2003)).

These include: (1) whether an important government interest is at stake; (2) whether the government's intrusion into the lives of gay individuals significantly furthers that interest; and (3) whether the intrusion is necessary to further that interest. *Witt v. U.S. Dept. of Air Force*, 739 F. Supp. 2d 1308, 1313 (W.D. Wash. 2010) (interpreting the Ninth Circuit's direction in *Witt* upon remand). Put another way, "when the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest." *Witt*, 527 F.3d at 819. If it does not, then the action is violative of substantive due process.

As to the first factor, the Court agrees with Montana that its registration requirement, in general, serves several important governmental interests. (Doc. 17 at 8.) Defendants maintain such interests include reducing recidivism among sexual offenders, providing law enforcement officers with updated information, "prevention of victimization and prompt resolution of sexual or violent offenses," and the protection of vulnerable groups and the public in general. (*Id.* at 8–9; *see also Montana v. Hamilton*, 164 P.3d 884, 887 (Mont. 2007)). Without a doubt, "[s]ex offenders are a serious threat in this Nation," who prey on vulnerable

43

populations and "are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault," upon re-entry into the community. *Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 4 (2003).  Accordingly, the Court has no trouble concluding that Montana's registration requirement serves the important governmental interests of protecting the community from sexual offenders and helping to apprehend repeat offenders.

Defendants also assert an interest in administrative convenience, arguing that "efficient administration and public safety would be hindered" if they had to "individually assess" a person's underlying conviction rather than simply relying on the fact that the person was convicted of a crime in another jurisdiction for which they must register.  (Doc. 17 at 9.)  But this alone cannot constitute an "important" governmental interest justifying the infringement of a substantive due process protection.  *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (noting that "although efficacious administration of governmental programs is not without some importance, the Constitution recognizes higher values than speed and efficiency").  In other words, the Court is not prepared to hold that administrative convenience, standing alone, constitutes an important enough governmental interest to justify the infringement of Menges' substantive due process rights.

As to the second factor, the Court finds that none of the important governmental interests at stake in this matter are significantly furthered by forcing

Menges to register as a sexual offender.  As discussed at length above, the conduct forming the basis of Menges' registration requirement is constitutionally protected by the substantive component of the Due Process Clause.  The Court rejects any notion that engaging in consensual intimate sexual activity with a person of the same sex renders an individual a threat to the public or more likely to commit a sex crime. That is, Montana's important governmental interest in keeping track of sexual offenders is not substantially furthered by including Menges on that list.  This factor weighs overwhelmingly in his favor.

As to the final factor, the Court focuses on whether there are less intrusive means that could similarly accomplish the important governmental interest at stake. *Witt*, 527 F.3d at 819.   "In other words, for the third factor, a less intrusive means must be unlikely to achieve substantially the government's interest."  *Id.*  In this case, Montana could advance its interests in protecting the public from sexual offenders without intruding on Menges' rights—simply and specifically, by not requiring him to register.   As noted above, because Menges cannot fairly be characterized as the sort of "sexual offender" Montana's registry is concerned with, the important governmental interests advanced by Montana remain furthered even if he is omitted altogether.  Accordingly, this factor weighs strongly in Menges' favor.

When Montana imposes adverse legal consequences on individuals by virtue of their engagement in intimate sexual contact with a person of the same sex, it

invites others "to subject homosexual persons to discrimination both in the public and in the private spheres." *Lawrence*, 539 U.S. at 575.  This sort of state action was condemned by *Lawrence* and runs afoul of the Constitution when accomplished through a sexual offender registration statutory scheme as done by Montana here.  In sum, Menges enjoys actual success on the merits with respect to his substantive due process claim.

### ii.    Equal Protection Claim.

Menges equal protection claim challenges the constitutionality of Montana's registration requirement, as applied to him.  As discussed at length throughout, under this statutory scheme, Menges must register because he was convicted of a crime in Idaho for which he must register in that State.  Mont. Code Ann. § 46-23-502(9)(b).  That crime, of course, was for doing nothing more than having oral or anal sex with another male.  Idaho Code § 18-6605.

The Fourteenth Amendment forbids Montana from denying "any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This promise, however, "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (noting that most laws will "differentiate in some fashion between classes of persons" without offense to the

guarantee of equal protection).  Accordingly, the Equal Protection Clause "is

essentially a direction that all persons *similarly situated* should be treated alike,"

*City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)

(emphasis added).

Unless a suspect classification is at issue or a fundamental right implicated,

"legislation is presumed to be valid" and prior cases instruct that in the realm of

"social or economic legislation," the mandate of equal protection affords "the

States wide latitude."  *Id.* at 440. (noting that "the Constitution presumes that even

improvident decisions will eventually be rectified by the democratic processes").

When presented with an equal protection challenge, the Court proceeds by: (1)

identifying the classifications drawn by the challenged statute and determining

whether they are similarly situated; (2) selecting the appropriate level of scrutiny;

and (3) applying the appropriate level of scrutiny.  *Gallinger v. Becerra*, 898 F.3d

1012, 1016 (9th Cir. 2018).  Accordingly, the Court turns first to the question of

classifications.

## 1.    Classification.

As noted above, any equal protection analysis must begin with the

identification of "the state's classification of groups."  *Gallinger v. Becerra*, 898

F.3d 1012, 1016 (9th Cir. 2018).  To accomplish this, the Court must first identify

"a classified group" before looking "for a control group . . . composed of

individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Id.*

The Ninth Circuit's discussion in *Harrison v. Kernan*, 971 F.3d 1069 (9th Cir. 2020) is illustrative of this process. In *Harrison*, a male inmate within the California prison system raised an equal protection challenge to the States' disparate allocation of allowable property among prison populations. *Id.* at 1071–72. Specifically, under the regulations at issue "female inmates of the *highest* security classification housed in general population [had] access to more personal property than male inmates in the *lowest* security classification housed in general population." *Id.* at 1072 (emphasis original).

In applying the classification formula, the Court first designated Harrison and men sharing his security classification as the classification group. *Id.* at 1075–76. The Court then concluded that because prison officials use "an identical methodology to determine security classifications of male and female inmates," those "female inmates of Harrison's security classification are an appropriate control group." *Id.* Summarizing, the Ninth Circuit explained that "the only relevant difference between Harrison and an imprisoned woman of the same security level and privilege group, when it comes to allowable property under the Department-wide regulation, is gender." *Id.* at 1076 (noting that "gender is the critical independent variable here"). With *Harrison* in mind, the Court endeavors

48

to identify the appropriate classification and control groups in this case.

Menges frames the classifications drawn by Montana's registration requirement, as applied to him, as 18 year old males who were convicted in 1994 under Idaho's Crimes Against Nature statute for engaging in consensual oral or anal sex with a 16 year old male and 18 year old males who were convicted in 1994 under Idaho's statutory rape provision for engaging in consensual vaginal intercourse with a 16 year old female.  (Doc. 29 at 30; *see also* Doc. 9-1 at 25.) Defendants do not mount any attack on these proposed classifications, instead asserting that Montana's registration requirement is facially neutral and draws no classifications at all.

The Court begins by reiterating the multi-layered statutory framework governing the registration of sexual offenders in Montana.  Under Montana law, persons must register as sexual offenders if they were convicted of a "violation of a law of another state . . . for which the offender was required to register as a sexual offender after an adjudication or conviction."  Mont. Code Ann. § 46-23-502(9)(b). While apparently facially neutral, this statutory provision cannot be read in isolation, and, indeed, necessarily contemplates an inquiry into the registration requirements of other states.  For this equal protection challenge, this Court must examine Idaho law.

Under Idaho law, 18-year old males convicted under Idaho's Crimes Against

49

Nature statute in 1994 for engaging in oral or anal sex with a 16-year-old male, must register as a sexual offender within that State.  Idaho Code § 18-8304(1)(a). On the other hand, an 18-year old male convicted under Idaho's statutory rape provision in 1994 for engaging in vaginal sex with a 16-year-old female, is not required to register under Idaho law.  *Id.* (specifically excluding those convicted under the statutory rape law "where the defendant is eighteen years of age"); *see also* Idaho Code § 18-6101(1) (1994) (proscribing sexual intercourse with any female under the age of 18).  Accordingly, although Defendants argue that Montana's registration requirement is facially neutral, the foregoing makes clear that its adoption of Idaho's sexual offender registration requirements renders it facially discriminatory.[11]

The Court finds that Menges has properly identified the classification and control groups that should govern his equal protection claim.  The classification group is properly composed of males, such as Menges, who were convicted under Idaho Code § 18-6605 in 1994 for engaging in consensual oral or anal sex as an

---

[11] Defendants argue that for Menges to prevail on his equal protection claim, he must demonstrate that they have acted "with an intent or purpose to discriminate against" him "based upon membership in a protected class."  (Doc. 30 at 10.)  While this is undoubtedly true in certain equal protection cases, *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005), it remains controlling Supreme Court precedent that a "showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification," *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985).  That latter situation is present here because, as explained above, Montana's registration requirement draws overtly discriminatory lines through its incorporation of Idaho law.

18-year old with a 16-year old male.  The control group is properly composed of

males who were convicted under Idaho Code § 18-6101 in 1994 for engaging in

vaginal sex as an 18-year old with a 16-year old female.  These two groups are

similarly situated in all relevant respects.  Both are comprised of males who

engaged in proscribed sexual activity with 16-year olds in 1994 when they were

18.  The only measurable difference is that the classification group engaged in oral

or anal sex with a male and the control group engaged in vaginal sex with a female.

The Court now turns its attention to the proper level of scrutiny this statutory

disparity must undergo.

## 2.      Appropriate Level of Scrutiny.

Even though there is only one Equal Protection Clause, courts deploy

differing standards of review depending on the situation.  *See Cleburne*, 473 U.S.

at 440–441.  In other words, the Supreme Court's jurisprudence on the issue of

equal protection has evolved to the point where a State needs a stronger (or

weaker) justification for its disparate treatment of similarly situated groups, in

various circumstances.  *Id.*  Under this framework, unless the statute at issue

implicates the exercise of a fundamental right (i.e. the right to marry a person of

the same sex) or proceeds along suspect lines (i.e. race, alienage, or national

origin), it need only survive rational basis review.  *Heller v. Doe by Doe*, 509 U.S.

312, 319 (1993).

The parties agree that rational basis review should govern Menges' equal protection claim.  (Docs. 29 at 31.)  The Court has concerns about this approach.  As discussed at length above, the Ninth Circuit has been clear that when *Lawrence* is implicated, rational basis review is inappropriate.  *Witt*, 527 F.3d at 817–19.  Although the Ninth Circuit was proceeding under the substantive due process context in *Witt*, the Supreme Court has been clear that the Due Process Clause and Equal Protection Clause share a "synergy" by which analysis under one informs analysis under the other.  *Obergefell*, 576 U.S. at 672–73; *see also Lawrence*, 539 U.S. at 575 (noting that "[e]quality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests").

Moreover, rational basis review is inappropriate when a statute implicates gender-based classifications.  *Cleburne*, 473 U.S. at 440–41 (noting that "[l]egislative classifications based on gender . . . call for a heightened standard of review").  As the Supreme Court recently held, discrimination based on sex encompasses discrimination on the basis of sexual orientation.  *Bostock v. Clayton Cty Ga.*, 140 S. Ct. 1731, 1754 (2020).  It logically follows then, if gender-based classifications need survive more than rational basis scrutiny than sexual orientation-based classifications would have to as well, because *Bostock* teaches

52

such forms of discrimination are essentially one and the same.  Ultimately, the

Court need not resolve this issue, because, as described below, it finds that the

classifications drawn by operation of Montana law in this case cannot survive even

rational basis review.

### 3.    Applying the Appropriate Level of Scrutiny.

To survive rational basis review, the disparity identified above in Montana's

sexual offender registration requirements must be "rationally related to a legitimate

government interest."  *United States v. Navarro*, 800 F.3d 1104, 1113 (9th Cir.

2015).  This standard is exceedingly deferential, and the burden is on Menges to

negate "every conceivable basis" that may justify the statute's classifications.

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993) (describing it as "a

paradigm of judicial restraint").  This Court is not a "superlegislature" that can

"judge the wisdom, fairness, or logic of legislative choices."  *Heller v. Doe by Doe*,

509 U.S. 312, 319 (1993).

When searching for a rational justification for the classifications drawn by

Montana's sexual offender registration statutes, however, this Court is free to

speculate as to why the Montana Legislature did what it did.  *F.C.C.*, 508 U.S. at

315 (holding that "we never require a legislature to articulate its reasons for

enacting a statute, it is entirely irrelevant for constitutional purposes whether the

conceived reason for the challenged distinction actually motivated the

legislature").  Indeed, an "absence of 'legislative facts' explaining" the purpose of the classifications "has no significance in rational-basis" review.  *Id.*  Accordingly, the Court endeavors to address the governmental objectives that might arguably be served by Montana's registration requirements, as applied to Menges.

The Court begins with the objectives put forward by Defendants. Defendants attribute the disparate treatment of the control and classification groups to "public health, safety, and welfare concerns" and to "further the State's interest in administrative convenience."  (Docs. 17 at 8–9; 25 at 12–13.)  Neither is rationally related to a legitimate state interest.   As previously discussed at length in the context of Menges' due process claim, while protecting the public is surely a legitimate state interest, it is *irrational* for Montana to accomplish this by requiring Menges to register as a sexual offender on the basis of a 1994 Idaho conviction for engaging in oral or anal sex with another man.  To put it simply, Menges' 1994 Idaho conviction for engaging in anal or oral sex with another man in no way indicates he poses a threat to the public health, safety, or welfare.

To the extent Montana argues that the presence of a 16-year old makes the difference, this argument is completely undermined by the fact that Montana does not require those convicted in 1994 under Idaho's statutory rape statute for engaging in sexual contact with a 16-year old female to register as a sexual offender.  In other words, if Montana's registration statutes, as applied to Menges,

were actually worried about protecting minors, they would not let persons in the control group be free from the registration requirement.

Montana's asserted interest in administrative convenience, is a similarly irrational justification for the statutory disparities between the control and classification groups identified above.  Defendants do not explain how the State's interest in administrative convenience would be hindered, should the proper agency be required to ascertain whether a person is being obligated to register as a sexual offender for a conviction under a statute called into question by *Lawrence*. And the Court agrees with Menges that given the uniqueness of his situation any additional administrative burden would be slight and avoiding it is insufficient to justify the statutory disparities occasioned on him by Montana's sexual offender registration statutes.

Additionally, Montana's claim of administrative convenience is further undermined by the fact that the State's registration statutes contemplate that an inquiry into Menges' offense conduct, along with other "sexual offenders" moving to Montana from other states, must be undertaken so that a proper "risk level designation" can been assigned.  Mont. Code Ann. § 46-23-509(6).  That is, when a person moves to Montana and must register as sexual offender pursuant to Montana Code Annotated § 46-23-502(9)(b), the proper agency must often undertake a fact-specific inquiry in order to assign that person a proper risk

assessment designation.  Accordingly, it is unclear how any administrative inconvenience would be imposed on the State by requiring it to examine the underlying offense conduct obligating a person to register in this State under Montana Code Annotated § 46-23-502(9)(b).  This interest is unavailing.

Other than protecting the public and administrative convenience, the Court cannot think of any governmental objective that would justify the unequal treatment Montana's sexual offender registration statutes occasions on Menges. Perhaps, Defendants could attempt to justify the statutory disparity by arguing it has a legitimate interest in obligating men who engaged in oral or anal sex with another man to register as sexual offenders.  But it is telling, and encouraging, they do not advance this argument.  Such an interest would clearly be both illegitimate and unconstitutional.  *See Romer v. Evans*, 517 U.S. 620, 633–36 (1996).

A survey of prior cases further illuminates the equal protection problem in this case.  In 1942, the Supreme Court made clear that it offends the guarantee of equal protection to impose adverse legal consequences on one group but not another when the two have committed "intrinsically the same quality of offense." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (striking down an Oklahoma law on equal protection grounds that subjected persons committing larceny to sterilization while exempting those committing embezzlement).  The Court reinforced this principle 30 years later, when it held that it offends the Equal

Protection Clause to forbid unmarried couples from obtaining contraception while at the same time permitting contraception to be obtained by married couples. *Eisenstadt v. Baird*, 408 U.S. 438, 453–55 (1979) (noting that "[i]n each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious").

Lower courts have adopted these principles to strike down laws that occasion similar disparate treatment to that at issue here.  For example, in *Kansas v. Limon*, the Kansas Supreme Court concluded that the State's decision to punish more harshly 18 year olds convicted of engaging in sexual contact with a same-sex minor than 18 year olds convicted of engaging in sexual contact with an opposite-sex minor, violated the guarantee of equal protection.  122 P.3d 22, 40–41 (Kan. 2005).  A preeminent disparity, similar to the situation here, was the requirement that only the former group was required to register as a sexual offender.  *Id.* at 24.

The Eastern District of Louisiana reached an identical conclusion in *Doe v. Jindal*, 851 F. Supp. 2d 995 (E.D. La. 2012).  In *Jindal*, several persons who had been convicted under Louisiana's Crime Against Nature by Solicitation statute (which criminalized the solicitation of oral or anal sex) filed suit complaining that it was unconstitutional to force them to register as a sexual offender when persons convicted for identical conduct under Louisiana's Prostitution statute were not required to register.  851 F. Supp. 2d at 997–98.  The Court relied on *Eisenstadt* to

conclude that the disparate sexual offender registration requirement for identical conduct violated the Equal Protection Clause because "there is no legitimating rationale in the record to justify targeting only those convicted of Crimes Against Nature by Solicitation for mandatory sexual offender registration." *Id.* at 1007.

The same conclusion holds true in this case. As discussed at length, under Montana law a person, such as Menges, must register as a sexual offender for being convicted under Idaho's Crimes Against Nature statute in 1994. A person engaging in precisely the same conduct but charged under Idaho's statutory rape statute need not. There is no rational basis for this disparity and "the relationship between the classification is so shallow as to render the distinction wholly arbitrary." *Id.* at 1009.

In sum, Montana has no rational basis for forcing Menges to register as a sexual offender on the basis of a 1994 Idaho conviction for engaging in oral or anal sex with a 16-year old male when he was 18, but not forcing those to register as a sexual offender who were convicted in Idaho in 1994 at the age of 18 for engaging in vaginal sex with a 16-year old female. Consequently, that operation of Montana law flouts the guarantee of equal protection and Menges enjoys actual success on the merits of his equal protection claim.

### iii.     Right to Privacy Claim.

Menges' final claim asserts that Montana's registration requirement violates

his right to privacy as secured by the state constitution.  He must prove this violation beyond a reasonable doubt.  *Malcomson v. Northwest*, 339 P.3d 1235, 1238 (Mont. 2014).  Interpreting the relevant authority, the Court finds that he has carried his burden.

The Montana Constitution recognizes that the "right of individual privacy is essential to the well-being of a free society" and forbids its infringement "without the showing of a compelling state interest."  Mont. Const., art. II, § 10.  It cannot be disputed that this provision "affords citizens broader protection of their right to privacy than does the federal constitution," *Gryczan v. Montana*, 942 P.2d 112, 121 (Mont. 1997), and constitutes "one of the most stringent protections of [the] right to privacy in the United States," *Armstrong v. Montana*, 989 P.2d 364, 373 (Mont. 1999).

Under the Montana Constitution, the right to privacy inquiry is two-fold, asking first whether the conduct at issue "is protected by Montana's constitutional right of privacy and then, if it is protected, whether the State has demonstrated a compelling interest for infringing that right."  *Id.* at 447.  As to the first inquiry— whether the conduct at issue is protected by Montana's constitutional right of privacy—prior cases instruct this Court to deploy the two-pronged test outlined by the Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967).  *See Malcomson*, 339 P.3d at 1240; *see also Gryczan*, 942 P.2d at 120–23 (applying both the *Katz*

59

test and another possible test before concluding that "regardless of the sort of test used" the conduct at issue was protected by Montana's right of privacy). This approach "requires a determination of whether the person claiming the right of privacy has (1) a subjective or actual expectation of privacy (2) that society is willing to recognize as reasonable." *Malcomson*, 339 P.3d at 1240.

Menges' claim under the Montana Constitution is nearly identical to that advanced under the Due Process Clause of the United States Constitution. Menges argues that by forcing him to register as sexual offender for engaging in conduct that is protected by Montana's right of privacy, that right has been infringed. (Doc. 9-1 at 32–33.) Defendants do not attack this argument directly, instead arguing, as they have for all of his claims, that interests of public safety and administrative convenience justify any intrusion on this right. (Docs. 17 at 8–9; 25 at 12–13.)

In determining whether Menges' conduct is protected by the Montana Constitution, the Montana Supreme Court's holding in *Gryczan* is the guiding light. There, it was held that Montana's right of privacy encompasses the right of individuals to engage in intimate sexual contact with a person of the same-sex. *Gryczan*, 942 P.2d at 121–24. That is, persons enjoy an actual expectation of privacy in their engagement in consensual sexual activity among persons of the same sex and society recognizes this expectation of privacy to be reasonable. *Id.* (noting "it is hard to imagine any activity that adults would consider more

60

fundamental, more private and, thus, more deserving of protection from governmental interference than non-commercial, consensual adult sexual activity").

In a subsequent case, the Montana Supreme Court succinctly described its holding in *Gryczan* as recognizing "the personal autonomy component of the right of individual privacy includes the right of consenting adults to engage in private, same-gender, non-commercial sexual conduct free from governmental interference, intrusion and condemnation." *Armstrong*, 989 P.2d at 374.  As noted above in the context of Menges' substantive due process claim, the intrusion and condemnation here stems from Montana's requirement that he register as a sexual offender for engaging in conduct protected by the Montana Constitution.  While clearly instructive, the Court must admit that *Gryczan* is not a perfect fit in all respects.

In *Gryczan*, the Montana Supreme Court was careful to limit its holding to *consensual* sexual activity among *adults.*  942 P.2d at 125 (holding "[t]he right of *consenting adults*, regardless of gender, to engage in private, non-commercial sexual conduct strikes at the very core of Montana's constitutional right of individual privacy") (emphasis added).   As discussed previously, the record establishes that the sexual contact at issue was consensual.  (Doc. 9-6 at 2, 7–8.)  Thus, the question becomes whether the presence of a 16-year old in this case pulls the conduct outside the scope of *Gryczan*.

As Menges points out, *Gryczan* does not define what it means by "consenting adults," and, under Montana law 16-year olds are capable of consenting to intimate sexual activity.  Mont. Code Ann. § 45-5-501(1)(b)(iv). Additionally, as discussed above, Montana's registration statutes, as applied to Menges, do not concern themselves with the age of the sexual partner that led to his 1994 conviction.  Instead, the sole focus in the underlying charging statute, which has been discussed at length, is with the type of sexual contact engaged in, not the age or sex of the participating parties.

That is, Menges must register because he was convicted of engaging in oral or anal sex with a person of the same sex, not because he had oral or anal sex with a minor or because such contact was nonconsensual.  On the contrary, this intimate sexual contact was by all accounts consensual and did not involve a minor-aged victim incapable of consenting to such contact as a matter of Montana law. Accordingly, through its registration statutes, Montana is imposing adverse legal consequences on Menges for engaging in the sort of conduct constitutionally protected by Montana's right of privacy.  The question becomes whether Defendants have a compelling state interest justifying the intrusion.

When undertaking the second right of privacy inquiry, the Court undertakes a "strict scrutiny analysis" by which the subject statute "must be justified by a compelling state interest and be narrowly tailored to effectuate that purpose."

*Malcomson*, 339 P.3d at 1239.  This is the "most stringent level of scrutiny" under which few laws survive.  *Driscoll v. Stapleton*, 473 P.3d 386, 392 (Mont. 2020).  And having already concluded that Montana's registration statutes, as applied to Menges, cannot survive heightened (substantive due process claim) or rational basis (equal protection claim) scrutiny, it has no trouble concluding it fails under the most exacting scrutiny there is.

In addition to the administrative convenience and public safety considerations previously rejected in the context of more favorable levels of scrutiny above, Defendants rely on prior cases from the Montana Supreme Court for the proposition that Montana's sexual offender registration statutes are narrowly tailored to serve compelling state interests.  (Doc. 30 at 11.)  Two cases inform this argument but are ultimately distinguishable from the situation at hand.  *See Montana v. Mount*, 78 P.3d 829 (Mont. 2003); *Montana v. Brooks*, 289 P.3d 105 (Mont. 2012).

In *Mount*, an individual convicted of sexual intercourse without consent in 1984, was charged with failing to register a sexual offender in 2000.  78 P.3d at 832–33.  He unsuccessfully moved to dismiss the charges on the basis that Montana's sexual offender registration statutes, as applied to him, violated the *ex post facto* clause of the Montana Constitution.  *Id.* at 833.  On appeal, he argued that to subject him to a sexual offender registration requirement after fully

63

discharging his sentence deprived him of his constitutional right of privacy in contravention of the restoration of rights provision of the Montana Constitution. *Id.* at 841–42.[12]

In resolving this claim, the Montana Supreme Court noted that "[w]hile Mount's right to privacy may be implicated by having to register and disclose his whereabouts, we conclude that the State had a compelling interest in enacting" its registration statutes. *Id.* at 842. These included protecting "the public from the recidivism of sex offenders," preventing the "victimization of vulnerable children," and "to assist law enforcement in keeping track of the whereabouts of sex offenders." *Id.* And, in the Montana Supreme Court's view, as applied to Mount, any "registration and disclosure requirements" were narrowly tailored. *Id.* Accordingly, no deprivation of Mount's right of privacy had occurred. *Id.*

The Court revisited the question in *Brooks*. There a recently-convicted arsonist with a significant criminal history argued that requiring him to "register as a violent offender" as a condition of his probation violated "his constitutional right to privacy." 289 P.3d at 106. Specifically, he maintained that it was unconstitutional to require him to "register as a violent offender as a result of what

---

[12] This provision states that "[f]ull rights are restored by termination of state supervision for any offense against the state." Mont. Const., art. II, § 28. The argument being that to subject Mount to a sexual offender registration requirement after the discharge of his sentence violated his right of privacy as secured by the Montana Constitution.

he describes as a 'single . . . isolated and out-of-character incident of arson." *Id.*
The Montana Supreme Court disagreed.

In rejecting his claim, the Court noted that because Brooks was "a convicted
felon and violent offender" he enjoyed a diminished expectation of privacy that
justified the State's intrusion into his life. *Id.* at 108. Put another way, because of
his "conviction of felony arson, he has a diminished privacy interest in the personal
information required at his registration." *Id.* Applying strict scrutiny, the Court
observed that "Brooks has a track record of drinking and making poor decisions,
and associated his alcoholism with his legal problems—which include felony and
misdemeanor convictions." *Id.* at 109. Consequently, it concluded that the "State
clearly has a compelling interest in requiring Brooks [to] register to protect the
public from potential future crimes committed by Brooks as well as assist law
enforcement in investigating those crimes. *Id.*

Neither *Mount* or *Brooks* directly controls the outcome in this case. Mount
was a convicted rapist and Brooks was a convicted arsonist. Menges had
consensual sex with another male. Arson and rape are not protected by Montana's
right of privacy, but consensual intimate same-sex contact surely is. That
distinction is constitutionally significant and renders *Mount* and *Brooks* core
holdings inapplicable and undisturbed by a contrary ruling as to Menges.
To put it simply, as applied to Menges, Montana's registration requirement serves

no compelling governmental interest.  Any general compelling interests served by

Montana's registration requirement are not narrowly tailored to the extent they

reach those who have engaged in constitutionally protected conduct.

Under Montana's constitutional scheme, having consensual intimate sexual

contact with a person of the same-sex does not render someone a public safety

threat to the community.  It does not increase the risk that our State's children or

other vulnerable groups will be victimized, and law enforcement has no valid

interest in keeping track of such persons whereabouts.  And, while it can be

undoubtedly said that Montana's sexual offender registration statutes generally

serve compelling governmental interests, they are not narrowly tailored to serve

those interests to the extent they pull Menges within their grasp.  *Malcomson*, 339

P.3d at 1242 (concluding a Montana workers' compensation law served

compelling governmental interest, but was not narrowly tailored to the extent it

intruded on a right protected by constitutional right of privacy).   Menges enjoys

actual success on the merits of his right of privacy claim.  Having examined the

first injunctive factor, the Court turns its attention to the second factor.

### B.    Irreparable Injury.

It is well established that constitutional violations can constitute an

irreparable injury.  *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ.*

*Equity*, 959 F.2d 1401, 1412 (9th Cir. 1991); *Goldie's Bookstore, Inc. v. Superior*

*Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (noting that "constitutional infringement will often alone constitute irreparable harm"). This is especially true when the constitutional violations complained of are actively ongoing through the enforcement of an unconstitutional law. *See Great N. Res., Inc. v. Coba*, 2020 WL 6820793, 2–3 (D. Or. 2020).

As discussed at length above, enforcement of Montana's registration requirement against Menges has inflicted upon him three distinct constitutional violations. This includes his constitutional rights to substantive due process, equal protection, and privacy. And these violations are ongoing. Montana law actively imposes an ongoing registration requirement on Menges that is unlikely to abate in the future absent judicial action. *See* Mont. Code Ann. § 46-23-506 (generally requiring sexual offenders to register for the remainder of their life). Menges decision to escape the burdens of registration through non-compliance could be met with felony charges. Mont. Code Ann. § 46-23-507. The foregoing is more than sufficient to constitute irreparable injury supporting the issuance of a permanent injunction.

## C. Inadequacy of Remedies at Law.

With respect to constitutional violations, it is generally recognized that there is no adequate remedy at law to rectify any resulting injury. *Allee v. Medrano*, 416 U.S. 802, 814–15 (1974); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir.

67

2019); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm"), *rev'd and remanded on other grounds*, 562 U.S. 134. (2011); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).  As discussed at length, in this case Menges has suffered not one constitutional violation, but three.  And these violations are ongoing.  Given the circumstances, Menges has no adequate remedy at law absent injunctive relief.

### D.    Balance of the Hardships and Public Interest.

Turning to the final injunctive inquiry, the Court weighs the various hardships likely occasioned on the respective parties if injunctive relief sought by Menges were to issue, and whether such injunctive relief would be in the public interest.[13]  Without a doubt, constitutional injuries can inflict serious damage and the public interest is served through the enjoinment of an unconstitutional application of law.  *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("When weighing public interests, courts have consistently recognized the significant public interest in upholding First Amendment principles") (internal quotations omitted).

With respect to hardships, the difficulties imposed on him by way of

---

[13] Specifically, Menges requests permanent injunctive relief "enjoining Defendants from requiring" him "to register as a sex offender for his prior conviction under Idaho's Crimes Against Nature statute, I.C. § 18-6605."  (Doc. 1 at 13.)

Montana's registration requirement are significant.  The record reveals he has lost jobs and been denied housing.  Additionally, Montana's registration requirement obligates Menges to disclose sensitive information and he must live with being publicly designated a sexual offender, and certain private information is publicly disseminated.  Not to mention the abridgment of his right to substantive due process, equal protection and privacy.

The hardships occasioned on Defendants if the requested injunction were to issue are difficult to imagine.  Enjoining Defendants from obligating him to register as a sexual offender will have little effect beyond that immediate context.  As previously noted, Defendants have no valid interest in including Menges on the sexual offender registry and his omission will not impede any important objective which the registry ultimately serves.  In sum, the balance of hardships weigh strongly in Menges' favor.

The public interests at stake similarly weigh in favor of the issuance of the injunctive relief Menges seeks.  The Montana public benefits greatly from enforcement of their rights to substantive due process, equal protection, and privacy.  This is especially true here, where the specter of sexual offender registration is attached to the exercise of constitutionally protected conduct—such as engagement in intimate sexual contact with a person of the same-sex.  Moreover, as already stated multiple times, none of the governmental interests in

maintaining a sexual offender registry are served by Menges' inclusion. Engagement in intimate sexual contact with a person of the same sex, without more, cannot be said to render someone a threat to the public safety.

Having weighed the requisite factors and upon finding that Menges enjoys actual success on the merits, the Court will afford him the injunctive relief he seeks by enjoining enforcement of Montana's registration requirement, as applied to him. The Court will also afford him the various other declaratory and ancillary relief he seeks and enter judgment in his favor.

## ORDER

Accordingly, IT IS ORDERED that judgment shall be entered in Menges' favor.

IT IS FURTHER ORDERED that Defendants' are PERMANENTLY ENJOINED from requiring Menges to register as a sexual offender under Montana law for his prior conviction under Idaho's Crimes Against Nature statute, Idaho Code § 18-6605.

IT IS FURTHER ORDERED that the Court hereby DECLARES that:

1.      Menges' inclusion in Montana's Sexual or Violent Offender Registry for his 1994 conviction under Idaho's Crimes Against Nature statute, Idaho Code § 18-6605, is unconstitutional, as violative of his right to substantive due process under the Fourteenth Amendment to the United States Constitution, equal

protection under the Fourteenth Amendment to the United States Constitution, and right of privacy under Article II, § 10 of the Montana Constitution;

2.      Montana's Sexual or Violent Offender Registration Act's requirement that an individual register as a sexual offender for an out-of-state conviction for which that state requires registration, as required by Montana Code Annotated § 46-23-502(9)(b), is unconstitutional as applied to Menges.[14]

IT IS FURTHER ORDERED that Defendants shall:

1.      Permanently remove Menges from Montana's Sexual or Violent Offender Registry on or before Friday, May 21, 2021;

2.      Expunge all state records indicating Menges was ever subject to registration on Montana's Sexual or Violent Offender Registry on or before Friday, May 21, 2021; and

3.      Alert all agencies, including, but not limited to, courts, police departments, sheriff's departments, and the Federal Bureau of Investigation, who were provided information about Menges registration that this information is no longer valid, on or before Friday, May 21, 2021.

The Clerk of Court is directed to enter judgment and close the case file.

---

[14] The Court declines Menges' request that this relief extend to "anyone with a pre-*Lawrence* conviction for any statute in which engaging in oral or anal sex was the sole element." (Doc. 1 at 12.)  Given the various factual circumstances underlying such a conviction, the Court will not speculate on the constitutionality of other convictions not before the Court in this case.

DATED this 11th day of May, 2021.

Dana L. Christensen, District Judge
United States District Court