1   JoAnn Jett Corson
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 8006
3   Missoula, Montana 59807-8006
    406/829-7123 office
4   joann_corson@mtd.uscourts.gov

5   United States Court Reporter

6

7           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MONTANA
8                   MISSOULA DIVISION

9   RANDALL MENGES,                  )
                          Plaintiff,)   No. CV 20-178-M-DLC
10       vs.                         )
                                     )   **TRANSCRIPT OF**
11  AUSTIN KNUDSEN, Attorney General )   **HEARING ON MOTIONS**
    of the State of Montana; GARY SEDER, )
12  Bureau Chief of the Montana Crime )
    Information Bureau; and SARA     )
13  MALIKIE, head of the Sexual and  )
    Violent Offenders Program for the )
14  Missoula County Sheriff's Office, )
    each in their official capacities, )
15                       Defendants.)
    _____)
16

17       BEFORE THE HONORABLE DANA L. CHRISTENSEN
            UNITED STATES DISTRICT COURT JUDGE
18              FOR THE DISTRICT OF MONTANA

19

        Russell Smith United States Courthouse
20               201 East Broadway
               Missoula, Montana 59802
21             Tuesday, March 30, 2021
               13:31:46 to 14:44:25
22

23

24

            Proceedings recorded by machine shorthand
25      Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2    For the Plaintiff:          MS. ELIZABETH K. EHRET
                                 Attorney at Law
3                                Suite 104
                                 3800 O'Leary Street
4                                Missoula, Montana 59808

5                                MR. MATTHEW STRUGAR
                                 Attorney at Law
6                                Suite 2910
                                 3435 Wilshire Boulevard
7                                Los Angeles, California 90010

8    For the Defendant:          MS. HANNAH E. TOKERUD
                                 MR. J. STUART SEGREST
9                                Assistants Attorney General
                                 P.O. Box 201401
10                               Helena, Montana 59620

11

12                          **CONTENTS**

13   Proceedings ...........................................    3

14   Argument by Mr. Strugar ...............................   13

15   Argument by Ms. Tokerud ...............................   38

16   Rebuttal Argument by Mr. Strugar ......................   50

17   Reporter's Certificate ................................   55

18

19                          **WITNESS**

20   **For the Plaintiff:**

21   Mr. Randall Menges
         Direct Examination by Ms. Ehret .....................    5
22       Cross-Examination by Mr. Segrest ....................    8
         Examination by the Court ............................    8
23       Cross-Examination by Ms. Tokerud ....................   12

24

25

```
 1                          PROCEEDINGS
 2        (Open court.)
 3             THE COURT:  Good afternoon.  Please be seated.
 4             Kelsey, would you please call the matter on the
 5   Court's calendar this afternoon?
 6             THE CLERK:  This is the time set for a hearing in
 7   CV 20-178-M-DLC, Randall Menges v. Austin Knudsen, et al.
 8             THE COURT:  Counsel, good afternoon.
 9        (Counsel respond.)
10             THE COURT:  I have a seating chart here.  I see
11   Ms. Tokerud and Mr. Segrest for the state.
12             And Ms. -- is it "Ehret"?
13             MS. EHRET:  Yes, Your Honor.
14             THE COURT:  Mr. Strugar.  And help me with the
15   pronunciation:  Is it "Menges"?  "Menges"?
16             MR. MENGES:  "Menges," sir.
17             THE COURT:  "Menges."  Okay.  Thank you.
18             Well, let me just indicate at the outset it is my
19   practice to read everything that is filed in a case, and I
20   have done so in this case.  So I have read all of your briefs
21   and attachments and all of the information you provided to me.
22   And as you know, I issued an order on the 24th of last
23   month -- that's Document 32 in the docket -- consolidating the
24   preliminary injunction motion with a trial on the merits based
25   upon my belief that essentially I was dealing here with legal
```

1    issues and there was no reason to engage in discovery or

2    postpone an ultimate disposition in this case as it relates to

3    the issues that are before me.

4           Does either party anticipate presenting any

5    testimony this afternoon?

6           Ms. Tokerud?

7           MS. TOKERUD:  No, Your Honor.

8           MS. EHRET:  (Nodded head affirmatively.)

9           THE COURT:  Yes.

10          MS. EHRET:  Yes, Your Honor.  We plan to call

11   Mr. Menges.

12          THE COURT:  Okay.  All right.

13          Well, let's, let's just sort of summarize where we

14   are.  I've got a motion for preliminary injunction, fully

15   briefed -- that's the plaintiff's motion, obviously; a

16   defendant's motion to stay, fully briefed; and defendant's

17   motion to dismiss, fully briefed.  I also received an errata

18   as it relates, I believe, to the -- plaintiff's notice of

19   errata as it relates to the motion to dismiss.

20          And so I think probably we'll go ahead, since it is

21   the plaintiff's motion for preliminary injunction, Ms. Ehret,

22   I will start, then, with the plaintiff.  And I don't care how

23   you -- if you wish to make argument, if you wish to call

24   Mr. Menges and have him testify to start with, I will leave it

25   entirely up to you.

1          (Discussion off the record at counsel table.)

2              MS. EHRET:  Yes, Your Honor.  I'd like to call

3    Randall Menges.

4              THE COURT:  All right.

5              Mr. Menges, if you would come forward, please, and

6    the clerk will administer an oath.

7          (Oath administered to the witness.)

8              THE COURT:  All right, Mr. Menges.  If you'd make

9    yourself comfortable in the witness stand.

10             And, Ms. Ehret, perfect.  You may remove your mask

11   if you would like to do so.

12             And, Mr. Menges, same to you.  You can take your

13   mask off if you'd like to, if you'd like to do so.  It's

14   entirely up to you.

15             You may proceed.

16             WHEREUPON,

17                         MR. RANDALL MENGES,

18   called for examination by counsel for plaintiff, after having

19   been first duly sworn to testify the truth, the whole truth,

20   and nothing but the truth, testified as follows:

21                         DIRECT EXAMINATION

22   BY MS. EHRET:

23   Q    Could you please state and spell your name for the

24   record?

25   A    Randall Menges.  R-a-n-d-a-l-l, M-e-n-g-e-s.

1   Q    And where do you live?

2   A    Butte, Montana.

3   Q    And you're on the sex offender registry?

4   A    Yes, ma'am.

5   Q    What is the conviction that you're required to register

6  for?

7   A    Infamous crime against nature.

8   Q    And was that having -- for having sex with another man?

9   A    Yes, ma'am.

10  Q    And that conviction was in Idaho?

11  A    Yes, ma'am.

12  Q    In 1994?

13  A    Yes.

14  Q    Have you been denied housing because you're on the

15  registry?

16  A    Yes.

17  Q    Where was that?

18  A    In Seattle and in Idaho.

19  Q    Let's start with Idaho.  What kind of housing was that

20  that you were denied?

21  A    It was a homeless shelter.

22  Q    So you were denied staying at the homeless shelter?

23  A    Yes.

24  Q    And in Seattle, was that also a homeless shelter?

25  A    Yes.

1   Q     And then after, after you were denied the staying at the

2   homeless shelter in Seattle, where did you end up living?

3   A     On the streets.

4   Q     And have you been denied any employment opportunities

5   because of the registry?

6   A     Yes.

7   Q     Where was that?

8   A     Postmates, as well as a horse-hauling business.

9   Q     Regarding the horse-hauling business, what was the salary

10  for that job?

11  A     About $100,000 a year.

12  Q     And were you told why you were not given the job?

13  A     Yes.

14  Q     What was that reason?

15  A     She stated that it potentially could harm business if

16  clients looked me up, Googled my name.

17  Q     And what would they find when they Googled your name?

18  A     That I was on the sex offender registry.

19  Q     So you were denied that job because you were on the

20  registry?

21  A     Yes, ma'am.

22          MS. EHRET:  No further questions.

23          THE COURT:  All right.

24          Any cross-examination?

25      (Discussion off the record at counsel table.)

1          MR. SEGREST:  Just one, Your Honor.

2          THE COURT:  Go ahead, Mr. Segrest.

3                    CROSS-EXAMINATION

4    BY MR. SEGREST:

5    Q    Good afternoon, Mr. Menges.

6    A    Good afternoon, sir.

7    Q    This is the first we've heard about this horse-hauling

8    business.  When did this occur?

9    A    Approximately three months ago.

10   Q    Okay.  Did you tell your attorney about it?

11   A    Yes, sir.

12          MR. SEGREST:  Okay.

13          So I guess we'd object to that testimony,

14   Your Honor.  Not only have we not had a chance to take

15   Mr. Menges's deposition, we haven't even heard about this

16   particular claim.

17          THE COURT:  Well, I'm gonna overrule the objection.

18          MR. SEGREST:  No further questions, Your Honor.

19          THE COURT:  All right.

20          Mr. Menges, while you're on the stand, I'd like to

21   ask you a couple of questions.

22          And, Counsel, you can follow up if my questions

23   trigger any additional questioning on your part.

24          I wanted to establish some facts as it relates to

25   the original conviction.

1              So when was it that you were convicted?  Do you

2    remember month and year?

3              THE WITNESS:  I believe it was December of 1994.

4              THE COURT:  December of 1994.  And what was the --

5    and was this something that you -- was this a conviction that

6    you pled guilty to, or was it following a trial?

7              THE WITNESS:  There was an *Alford* plea.

8              THE COURT:  An *Alford* plea.

9              THE WITNESS:  Yeah.

10             THE COURT:  So in 1994, you entered an *Alford* plea.

11   And what was the sentence?

12             THE WITNESS:  Five years fixed with ten years

13   indeterminate, for a total of 15 years.

14             THE COURT:  Five years fixed with ten years

15   indeterminate, for a total of 15 years.

16             Have you fully discharged that sentence?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  And did you serve the entire five years

19   of the fixed portion of that sentence?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Where was that sentence served?

22             THE WITNESS:  In Idaho.

23             THE COURT:  In a custodial setting?

24             THE WITNESS:  I don't understand what you mean by

25   "custodial."

1           THE COURT:  Were you in prison?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  All right.  And then when you were

4   discharged, how long were you on supervised release or

5   probation, or whatever they call it in Idaho?

6           THE WITNESS:  It took the entire ten years.  They

7   made me do the entire 15-year sentence.

8           THE COURT:  Okay.  So when was it that you actually

9   completed and discharged that sentence?

10          THE WITNESS:  I believe, because Idaho takes time

11  away sometimes -- they don't have good time -- I believe it

12  was 2003, if my memory serves correctly.

13          THE COURT:  So if I add 15 to 1994, that results --

14  that would indicate the sentence would terminate in 2009, but

15  you believe, because of good time and other things --

16          THE WITNESS:  No.  I believe it was 2009, then.  It

17  took the entire 15 years.  I don't know where I got 2003,

18  Your Honor.  I'm just trying to remember.

19          THE COURT:  Yeah.  No, I understand.

20          So it was -- you believe, then, you may have

21  discharged the sentence in 2009 finally.

22          THE WITNESS:  Yes, sir.  It's a little confusing

23  because at the end of it I wasn't incarcerated, so -- but I

24  believe the total discharge was in 2009, then, because they

25  made me do the entire 15 years.

1          THE COURT:  Okay.

2          THE WITNESS:  I must have just got out of prison in

3     2003.

4          THE COURT:  Well, if the sentence was in 1994 and

5     there was five years fixed, then that portion of the sentence

6     would have ended in 1999.

7          THE WITNESS:  Yes, sir.  In the State of Idaho, when

8     I went to the parole commission, they gave me a parole date

9     which -- but in Idaho it's not immediate.  They set it out for

10    your release.  And so they gave me a parole date that I

11    believe was just over two years.  And so I had to do two more

12    years until they released me in 2003, which is, you know, when

13    the final release date was.

14         THE COURT:  Okay.

15         All right.  I don't have any other questions of

16    Mr. Menges.

17         Ms. Ehret, did my questions cause you to want to do

18    any followup?

19         MS. EHRET:  No, Your Honor.

20         THE COURT:  Ms. Tokerud, Mr. Segrest?

21       (Discussion off the record at counsel table.)

22         MS. TOKERUD:  One question, Your Honor.

23         THE COURT:  Yes.

24         MS. TOKERUD:  Thank you.

25    ///

```
 1                        CROSS-EXAMINATION
 2   BY MS. TOKERUD:
 3   Q     Good afternoon.
 4   A     Good afternoon, ma'am.
 5   Q     Did you challenge your 1994 conviction in Idaho?
 6   A     There was a postconviction challenge that related later
 7   on, but I'm not sure how -- I mean, in the end it was just
 8   kind of dismissed.  I'm not sure how it all worked out.  I
 9   don't understand legal stuff very much.
10             MS. TOKERUD:  No further questions.
11             THE COURT:  Okay.
12             Anything further?
13             MS. EHRET:  No, Your Honor.
14             THE COURT:  Mr. Menges, you can return to counsel
15   table.
16             THE WITNESS:  Thank you, sir.
17             THE COURT:  Thank you, sir.
18             Ms. Ehret, any additional witnesses?
19             MS. EHRET:  No, Your Honor.
20             THE COURT:  Any witnesses from the state?
21             MS. TOKERUD:  No, Your Honor.
22             THE COURT:  Okay.
23             So it looks like now we're to the point where we're
24   going to have some argument.  I didn't put either of you on
25   the clock, but I'd like you both to endeavor to confine your
```

1    argument, if you could, to a total of 45 minutes per side, and

2    hopefully that gives you enough time.  Now that's exclusive of

3    any questions that I might ask, and I suspect I'll probably

4    have some questions for you.

5              But, Ms. Ehret, why don't you go ahead.  Why don't

6    you proceed first, if you would, please.

7              MR. STRUGAR:  Your Honor, I'll be arguing.

8              THE COURT:  All right.  Mr. Strugar.

9              MR. STRUGAR:  Good afternoon, Your Honor.  Matthew

10   Strugar for the plaintiff.

11             With the Court's permission, I'd like to reserve ten

12   minutes of my 45 for rebuttal.

13             THE COURT:  You may.

14             MR. STRUGAR:  Should I keep my own time?

15             THE COURT:  Nope.  I've got a, I've got a timepiece

16   up here.  I'll keep track of it.

17             MR. STRUGAR:  Your Honor, as you just heard,

18   Mr. Menges was convicted in 1994 shortly after his 18th

19   birthday of having oral sex with another young man.

20             THE COURT:  Mr. Strugar, if you wouldn't mind, could

21   you take your mask off --

22             MR. STRUGAR:  Certainly.

23             THE COURT:  -- unless you feel uncomfortable up

24   there without a mask.

25             MR. STRUGAR:  No, that's fine.

1          THE COURT:  All right.  Thank you.

2          MR. STRUGAR:  He was convicted under an Idaho law

3    that criminalized all oral and anal sex.  In 1994, such

4    prosecutions and convictions were legal.  Idaho's law was

5    indistinguishable from the Georgia sodomy law, upheld on a

6    facial challenge by the Supreme Court in 1986 in *Bowers v.*

7    *Hardwick*.

8          Because he was convicted of having oral sex with

9    another man in 1994, Montana requires him to register as a sex

10   offender in 2021.  No one contests that the law in 1994

11   allowed for prosecutions for gay sex or that such prosecutions

12   happened.  The only thing in dispute is how to deal with those

13   prosecutions today, and that is because in 2003 the Supreme

14   Court in *Lawrence v. Texas* overruled *Bowers*.

15         And that's the heart of the question of the

16   substantive due process claim, Your Honor:  What did *Lawrence*

17   do?  Did sodomy-only statutes, the 13 that were remaining at

18   the time, did they survive *Lawrence*?  And, if they did, what

19   effect does *Lawrence* have on those pre-*Lawrence* convictions?

20         Our position is that *Lawrence* invalidated those

21   13 still-existing sodomy laws.  As I understand the state's

22   position, it's that *Lawrence* inval- -- sorry.  It's that

23   *Lawrence* was an as-applied ruling to those two defendants or

24   that *Lawrence* rewrote those still-existing sodomy laws to

25   include other elements.  Our position is supported by the text

1    of *Lawrence* itself, by subsequent Supreme Court precedent, and

2    by the Fourth Circuit's opinion in the *Macdonald v. Moose*

3    case.

4         In *Lawrence*, eight references by the majority to

5    what they're doing as -- or, sorry, to the question at issue

6    as to whether or not the statute was, quote, valid, indicating

7    they were assessing it for facial validity.  There are many

8    references throughout the majority opinion to "laws," plural,

9    indicating they were doing more than just assessing the Texas

10   law.  And they overturned *Bowers*.  *Bowers* was a facial

11   challenge to Georgia's sodomy-only statute.

12        And they did so on substantive due process grounds

13   and not equal protection grounds because, as the majority

14   said, some might question whether a prohibition would be valid

15   if drawn differently, say, to prohibit conduct between

16   same-sex and different-sex participants; here, the Court again

17   expressing that what they're doing is beyond simply the Texas

18   statute, that it's a broad ruling.

19        Justice O'Connor in her concurrence twice states

20   that she joins the majority in declaring the Texas statute

21   unconstitutional.  The Fourth Circuit found that that's

22   exactly what happened in that Virginia sodomy-only statute

23   law, which was indistinguishable from Idaho's,

24   indistinguishable from Georgia's, and mostly indistinguishable

25   from Texas's -- I say "mostly" because Texas was limited to

1    same-sex sex activity whereas the other ones outlawed all oral
2    and anal sex.   The Fourth Circuit found that *Lawrence*
3    invalidated Virginia's sodomy-only statute.

4           And in *Obergefell*, the same-sex marriage cases, in
5    describing what *Lawrence* did, the Supreme Court stated, quote,
6    "*Lawrence* invalidated laws that made same-sex intimacy a
7    criminal act."   In this 11-word sentence, the Court uses
8    "invalidated" to show that they're doing facial relief, a
9    broad ruling, and they use "laws" plural to show that it was
10   more than just Texas's law at issue.   Even Chief Justice
11   Roberts' dissent in *Obergefell* talks about invalidating facial
12   relief "laws" plural.

13          And honestly, Your Honor, that should be
14   game-set-match for this dispute.   Nobody knows what the
15   Supreme Court did in *Lawrence* better than the Supreme Court
16   itself, and *Obergefell* talks about it invalidating laws like
17   Idaho's, like Virginia's, like Georgia's, like Texas's.

18          And so it's as simple as that.   If the sodomy-only
19   statute in Idaho is invalid, Menges can't be forced to
20   register.   *Danforth v. Minnesota*, Supreme Court, said that if
21   a statute is unconstitutional, quote, "then so is enforcement
22   of all identical statutes in other States, whether occurring
23   before or after our decision."

24          But ultimately, to grant Mr. Menges relief today,
25   the Court doesn't even have to wade into what *Lawrence* did

1    moving forward or if *Lawrence* added, you know, words to

2    Idaho's statute or additional elements because Mr. Menges was

3    convicted before *Lawrence*.  He never had a chance to argue

4    that his conduct was within the supposed rewriting of *Lawrence*

5    or that it was unconstitutional to convict him because of, you

6    know, what *Lawrence* did to the sodomy statute.  No one in 1994

7    was, because *Lawrence* hadn't come down yet.  All the state

8    needed to prove was that he had oral sex, and that's all he

9    pleaded to, and that's the only reason Montana forces him to

10   register today.

11           Our privacy claims essentially are the same except

12   instead of *Lawrence* we rely on the *Gryczan* out of the Montana

13   Supreme Court.  We can see the Montana Supreme Court talks

14   about a right to consenting adults, and Mr. Menges, when he

15   was 18, had oral sex with a 16-year-old, but the age of

16   consent in Montana generally is 16.  There's no indication

17   that *Gryczan* intended to set up a sort of bifurcated system

18   whereby heterosexual vaginal/penile sex was provided a

19   16-year-old age of consent, whereas oral and anal sex required

20   the participants to be 18.

21           And then we have an equal protection claim that

22   really has nothing to do --

23           THE COURT:  Before you get to the equal protection

24   claim, Mr. Strugar, the reason why I asked Mr. Menges

25   questions about the timing of the events surrounding his

1    conviction, including when he was incarcerated and any term of

2    probation or supervised release that followed that

3    incarceration, as you might suspect, is I was wondering

4    whether he had completely discharged his sentence prior to the

5    issuance of *Lawrence* in June of 2003.

6         You have just indicated to me that he was convicted

7    prior to *Lawrence*.  Do you know whether or not your client

8    sought habeas relief?  Based on what he's saying to me, he was

9    still serving this sentence for five or six years following

10   the issuance of *Lawrence*.  Do you know whether or not he

11   sought habeas relief on the basis of *Lawrence*?

12        MR. STRUGAR:  I don't believe there's any indication

13   that he did.  There was a postconviction relief motion filed,

14   I still think pre-*Lawrence*, in the late '90s, just arguing

15   that I think the sentence was too long.

16        THE COURT:  Okay.

17        MR. STRUGAR:  I don't quite remember what that

18   petition got to because it got -- it ultimately was dismissed

19   because Mr. Menges was unable to continue to keep paying those

20   attorneys.

21        THE COURT:  Okay.  All right.  So how does, how does

22   the timing impact the argument that the state is making based

23   on *Heck*?

24        MR. STRUGAR:  Yeah, I don't think the timing has any

25   effect on the argument that we're talking about in *Heck*.

1    *Heck*, you know, seeks to bar -- at least in the Ninth Circuit,

2    Your Honor, *Heck* looks to what the nature of the relief is,

3    whether it's prospective or retrospective.

4           So if you look at Mr. Heck himself, Mr. Heck was

5    arrested, convicted, still serving a sentence when he files a

6    claim claiming unlawful arrest, a 1983 claim for damages.  And

7    the Supreme Court says, of course, that would, saying that he

8    was falsely arrested, would obviously call into question his

9    conviction, call into question his continuing confinement.  So

10   they sort of create this abstention, essentially an abstention

11   rule about getting around habeas.

12          There's significant questions today about whether

13   *Heck* even applies to plaintiffs who are out of custody.  In

14   *Spencer v. Kemna*, there were five justices, and a combination

15   of concurring and dissenting opinions say that *Heck* doesn't

16   apply to out-of-custody plaintiffs.

17          And then in 2004 and 2005, in *Muhammad v. Close* and

18   *Wilkinson v. Dotson*, the Supreme Court applied the rule as if

19   that was the rule, focusing on whether those plaintiffs had

20   habeas availability at the time they filed their complaint,

21   they filed their 1983 complaint.

22          And there's a circuit split today.  There's sort of

23   a small majority -- Second, Fourth, Sixth, Seventh, Tenth, and

24   Eleventh -- that say *Heck* doesn't apply to an out-of-custody

25   plaintiff.  There's a small minority -- the First, Third,

1   Fifth, and Eighth -- say that it can.

2          But the Ninth Circuit kind of goes its own way, and

3   it has this rule from *Martin* about whether or not there was --

4   the nature of relief sort of sought is prospective or

5   retrospective.  So the plaintiffs in *Martin*, homeless people

6   who had been arrested in Boise for sleeping outside, filed a

7   1983 suit saying they want damages for those arrests and the

8   time they served on them.  They want expungement of their

9   criminal convictions, and they want the statute to be enjoined

10  moving forward.  And the Ninth Circuit says expungement,

11  declaration that their, you know, original convictions were

12  unlawful, the damages, those are all retrospective relief.

13  But saying the statute is unconstitutional moving forward,

14  that's prospective relief, and *Heck* doesn't get at that.

15         I think maybe an even better decision for us is the

16  Ninth Circuit's opinion in -- I'm probably going to botch the

17  name of this case -- but it's *Huftile v. Miccio-Fonseca*, and

18  it's cited at page 15 of our opposition to the motion to

19  dismiss.  And there we have a man who is confined under

20  California Sexually Violent Predators Act.  He's in civil

21  commitment, and he says the psychiatrist who evaluated him did

22  so using procedures that were unconstitutional.  He asked for

23  damages for that initial confinement.  He asked for a

24  declaration that those procedures were unconstitutional; and

25  he asked for an injunction moving forward, saying, "You can't

1   use these procedures against me in the future."

2          So the Ninth Circuit says there's two of those

3   requests for relief that are retrospective, saying that his

4   initial confinement was unconstitutional, damages for that,

5   but saying that those unconstitutional practices can't be

6   enjoined moving forward is prospective in nature.  It doesn't

7   sort of question the validity of his original conviction.

8          And that's the situation that Mr. Menges faces; also

9   subject to a civil restraint scheme, obviously less onerous

10  than civil commitment, but he doesn't have -- he's not asking

11  for any relief that would get at what the *Heck* cases call the

12  core of the habeas nature of relief that *Heck* is concerned

13  with.  He's not in confinement.  He has no access to habeas

14  currently.  He's only seeking prospective relief.  He's

15  seeking prospective relief because under the law as it exists

16  today, Menges didn't commit a crime.

17          The state's own --

18          THE COURT:  Mr. Strugar, let me ask you:  Are you

19  familiar with -- it is a Southern District of Mississippi case

20  from 2018, *Doe v. Hood*.

21          MR. STRUGAR:  I am.  I was counsel in that case,

22  Your Honor.

23          THE COURT:  Oh, you were.

24          MR. STRUGAR:  I was, yes.

25          THE COURT:  All right.  In front of Judge Reeves.

1          MR. STRUGAR:  Yes, Your Honor.

2          THE COURT:  And so what -- tell me what Judge Reeves

3    was thinking and what he was doing in that case when he

4    appears to have remanded that for -- or he did something as it

5    relates to --

6          MR. STRUGAR:  Sure.

7          THE COURT:  -- to *Heck*.

8          MR. STRUGAR:  To *Heck*.

9          THE COURT:  Yeah.

10         MR. STRUGAR:  There's a lot I could say about *Doe v.*

11   *Hood*.  We filed it as a class action that we filed in 2015.

12   There were about 70-something class members.  We settled out

13   about half the class, at which point we sort of ruined our own

14   numerosity, and then were proceeding with just one plaintiff

15   who had a conviction from the 1970s.

16         And the Fifth Circuit just has very different *Heck*

17   precedent than the Ninth Circuit does.  The Fifth Circuit says

18   if a plaintiff ever had access to *Heck* -- ever had access to

19   habeas relief, that no matter how prospective or retro- -- you

20   know, no matter how prospective the relief is, that *Heck* bars

21   it.  It just has a very sort of punitive *Heck* structure that

22   the Ninth Circuit does not employ.

23         So Judge Reeves said, sort of like the situation we

24   have here -- here, the states made some arguments that

25   Mr. Menges could go seek postconviction relief in Idaho.

22

1    Well, there's a one-year statute of limitations in Idaho, and

2    he was convicted in 1994.  Mississippi's, I think, had

3    180 days or something like that.  So our argument to Judge

4    Reeves was, "You could send us to state court, but he's

5    decades outside the statute of limitations, so, you know, he's

6    not going to get relief there."

7         And Judge Reeves essentially told us, "Go try,

8    because the Fifth Circuit's *Heck* bar is what it is and it's so

9    punitive.  If you don't get it, come back to me and I'll give

10    you what you want."

11         We filed for it, and the state -- smartly, I think,

12    knowing that they were going to get a broader ruling in a 1983

13    ruling that would trigger 1988 fees and whatnot -- just didn't

14    oppose the petition.  And despite the fact that it was decades

15    and decades outside of the statute of limitations, they

16    granted the plaintiff's motion for postconviction relief.

17         THE COURT:  Relief.

18         MR. STRUGAR:  So in that case, you know, we didn't

19    get a final judgment, but we -- I'm sorry; we got a stipulated

20    judgment for the half of the class that we settled out.  We

21    never got a final judgment for Mr. Doe in that case.

22         THE COURT:  In federal court.

23         MR. STRUGAR:  In federal court.

24         THE COURT:  But you got habeas relief.

25         MR. STRUGAR:  We did.

1          THE COURT:  All right.  Thank you.  I didn't mean to

2     get off on a tangent on *Doe v. Hood*.

3          MR. STRUGAR:  Sure.

4          THE COURT:  And I didn't realize that you had been

5     counsel in that case.

6          Yes, here it is.  I see that now.

7          MR. STRUGAR:  I'm familiar with it, Your Honor.

8          THE COURT:  Thank you.

9          MR. STRUGAR:  That's how I ended up on this case and

10    how I ended up on the Idaho case.

11         THE COURT:  Yeah.

12         MR. STRUGAR:  One last thing about *Heck*, and this

13    isn't in the briefing but it came to me as I was preparing for

14    this argument.  I think even if you accept the state's

15    argument about *Heck*, which we don't believe is right, but even

16    if you were to, it still wouldn't apply to the equal

17    protection claim.  The equal protection claim doesn't seek to

18    challenge anything about his conviction.  It says just today.

19    You know, his conviction could be completely valid, and the

20    equal protection claim would be still exactly what it is even

21    without *Lawrence*.

22         We're just saying that there's no rational basis to

23    distinguish between a situation whereby someone who is

24    heterosexual and has vaginal sex with a 16-year-old when

25    they're 18 doesn't have to register, while someone who has

1    oral sex when they're 18 with a 16-year-old does.  And that

2    really doesn't get at any question about sort of whether the

3    conviction was proper at the time; it just asks whether

4    there's a rational basis for that distinction in the

5    registration scheme.

6             So our position is that *Heck* doesn't bar the

7    substantive due process or the privacy claims.  But even if it

8    did, it wouldn't get at the equal protection claim.

9             THE COURT:  I know you're going to get into the

10   equal protection claim, but both parties appear to agree that

11   rational-basis review should govern your client's equal

12   protection claim.  I'm a little curious as to why you didn't

13   seek to persuade me that strict scrutiny ought to apply here,

14   or maybe intermediate scrutiny.

15            MR. STRUGAR:  Sure.  I mean, in some sense it is a

16   gender discrimination distinction.  There is that recent

17   Title VII --

18            THE COURT:  Right.

19            MR. STRUGAR:  -- case out of the Supreme Court.  I

20   just don't think -- I think we're certainly trending in that

21   direction.  I don't think we're there yet.  I mean, I don't

22   think the Supreme Court -- and that was more of a statutory

23   interpretation than it was an equal protection clause

24   decision, as I remember it.

25            And to be frank, we've gotten a lot of traction in

1    the gay rights movement in equal -- in, sorry, in

2    rational-basis cases.  We have, we have *Romer v. Evans*, we had

3    *Windsor*, and we have -- *Obergefell* was sort of a combination

4    substantive due process/Equal Protection Clause claim.  And we

5    just thought we had the facts on rational basis that we didn't

6    need to sort of create new law or recognize new standards

7    here, because I think we win under rational basis, Your Honor.

8            There's a significant line of cases that would

9    support finding that there's no rational basis, starting with

10   the contraception cases of *Eisenstadt* and *Carey* where the

11   Supreme Court said there is no rational basis to allow married

12   couples to have contraception but prevent unmarried couples,

13   or to allow 16-year-olds access to contraception but not

14   15-year-olds, on through what I think is maybe one of the best

15   cases for us on rational basis, the *Limon* case out of the

16   Kansas Supreme Court.

17           They have a situation pretty similar to Mr. Menges:

18   Living in an institutionalized setting.  17-year-old man turns

19   18.  Shortly after his 18th birthday, he has sex with another

20   resident.  That resident was 14 in Mr. Limon's case.

21   Mr. Limon was sentenced to 17 years and made to register,

22   while as if he was an 18-year-old who had heterosexual sex

23   with a 14-year-old girl, he would have received approximately

24   one year and no registration.  He loses at the trial court.

25   He loses at the Kansas intermediate appellate court.  He loses

1    at the Kansas Supreme Court.  The U.S. Supreme Court grants,

2    holds for the decision in *Lawrence*, remands.  Goes back to the

3    Kansas intermediate appellate that again finds that there's a

4    rational basis, until finally the Kansas Supreme Court, after

5    Mr. Limon had served five and a half years of his sentence,

6    said there's just no rational basis to have this distinction

7    between the types of sex acts or the gender of the

8    participants.  The state there argued things like promoting

9    procreation or preventing venereal disease, but the Kansas

10   Supreme Court said those just don't hold up.

11           And that leads nicely into *Doe v. Jindal and*

12   *Caldwell*, sort of a predecessor to the *Doe v. Hood* case in

13   Mississippi, some of the same plaintiffs.  In that case,

14   Mississippi required people convicted of sort of heterosexual

15   vaginal prostitution to -- I mean, there was no registration

16   requirement for sort of vanilla prostitution, but there was a

17   registration requirement for prostitution involving oral or

18   anal sex.  And, again, the states -- Louisiana put forward a

19   lot of the same bases, saying that it supported -- to support

20   the law that Kansas did.  And the district court in both of

21   those cases said those just don't hold up and struck it down

22   on rational basis.

23           So those are some of the reasons we didn't sort of

24   try to push for intermediate or strict scrutiny because we

25   think we win even on the easiest standard, Your Honor.

1          THE COURT:  My concern about the equal protection

2   claim is that -- and I, one of the other cases that I read was

3   this 2020 case in *State of Idaho v. Gomez-Alas*.  And in

4   looking at the two statutes in question in Idaho, it doesn't

5   appear that the statutes in question here draw any distinction

6   regarding sex or age and do not appear to exclusively target

7   homosexual activity, which causes me some concern as it

8   relates to the equal protection argument.  Can you address

9   that?

10          MR. STRUGAR:  I can.  Let me start with, let me

11   start with age.

12          It's not -- our argument is not that the Idaho

13   "crime against nature" statute distinguishes between age.

14   It's that the Idaho registration scheme that Montana adopted

15   in 2005 distinguishes between age.

16          So, for instance, in Montana today, there's a

17   16-year-old age of consent.  In Idaho today, there's what's

18   called a Romeo and Juliet statute, whereby to constitute

19   statutory rape there needs to be a sufficient age difference

20   between the minor and the adult.  So an 18-year-old -- it has

21   to be more than two years.  So an 18-year-old having sex with

22   a 16-year-old does not constitute statutory rape.  In Idaho

23   today, an 18-year-old having sex, consensual sex with a

24   15-year-old does.  So that's how the Romeo and Juliet statute

25   works.  But in 1994, we concede in Idaho any sex between an

1    adult and a minor was considered statutory rape.

2            The equal protection argument comes in because Idaho

3    has carved out a textual statutory exemption in its

4    registration law, saying people who were 18 when they were

5    convicted of statutory rape do not need to register.

6            THE COURT:  Okay.

7            MR. STRUGAR:  So anyone who is 18 and has sex with a

8    16-year-old under heterosexual vaginal sex escapes

9    registration in Idaho and doesn't carry that registration over

10   to Montana that has wholesaledly adopted that registration

11   scheme.  But, you know, anyone who is convicted of crime

12   against nature when they're 18 with a 16-year-old or, frankly,

13   crime against nature with anybody --

14           THE COURT:  Right.

15           MR. STRUGAR:  -- anyone does.

16           So that's where the equal protection comes in; that

17   somebody in Mr. Menges's situation, if he had had heterosexual

18   sex, would escape registration, whilst he has to register, and

19   there's no rational basis for that.

20           THE COURT:  Okay.

21           MR. STRUGAR:  As to the question of distinguishing

22   between gender or sex, that's correct.  The Idaho statute

23   prohibits all oral and anal sex no matter the sort of gender

24   or sex of the participants, but that's no different than the

25   Georgia statute that the Supreme Court first upheld and then

1    overturned, first in *Bowers* and then in *Lawrence*.  The Georgia

2    statute was not, unlike the Texas statute, was not limited to

3    purely homosexual sex acts.  It prohibited, like most sodomy

4    statutes, all oral and anal sex wholesale.  And, you know, in

5    *Lawrence*, in some pretty stark terms, the Supreme Court said

6    *Bowers* was wrong when it was decided and it's wrong today.

7         So -- and just a few words about the *Gomez-Alas*

8    decision.  You know, *Gomez-Alas* was not a facial challenge.

9    It was an as-applied challenge.  Mr. Gomez-Alas had the

10   opportunity to argue that sort of -- he had a jury instruction

11   that required the jury to find that it was against the will of

12   the victim, and he lost that at trial.

13        Now I think the Supreme Court did some pretty

14   strange things with "against the will," saying that, you know,

15   it needs to be affirmative consent and all these sort of

16   extratextual sort of outside of Idaho criminal -- all the

17   Idaho criminal law, but sort of how the state uses *Lawrence*

18   convictions -- or uses sodomy convictions moving forward past

19   *Lawrence*, you know, I have my own sort of personal

20   disagreements with Idaho Supreme Court and how that came out,

21   but I don't think it has any effect on what you can do sort of

22   looking backwards.

23        You know, we have a procedural due process claim in

24   the similar Idaho case because the Idaho courts claim when we

25   have somebody with a pre-*Lawrence* conviction, we do an

1   investigation of the police reports and the indictment and all

2   these other things to sort of determine:  Would this

3   registrant have been convicted under our new *Lawrence* scheme?

4   So they sort of perform some kind of guesswork and decide

5   whether or not they thought they could have obtained the same

6   conviction or whether that conviction would have, yeah, would

7   have actually been entered under the new *Lawrence* scheme.  And

8   we say, well, if you're gonna sort of have a second trial,

9   clients need to be a part of that.

10          Now Montana, in the stipulated facts that we filed

11   yesterday with the Court, Montana says, you know, they don't

12   assert that they sort of do these post hoc investigations.

13   They say, "We rely on the other state's registration

14   requirements wholesale."

15          So, yeah, those are just a few, a few of the

16   distinctions between *Gomez-Alas* sort of post-*Lawrence* and

17   Mr. Menges's conviction nine years before.

18          A few points about standing, and then I'll conclude

19   on the preliminary injunction -- or the permanent injunction

20   motion.

21          The state's attack on Mr. Menges's standing is sort

22   of an attack on both his injury and then an attack on the sort

23   of combination of causation or redressability.  As to the

24   injury, the argument was primarily that Mr. Menges did not --

25   does not reside in Montana.  As the Court heard earlier,

1    Mr. Menges has relocated to Montana earlier this month.

2              THE COURT:  That is a stipulated fact.

3              MR. STRUGAR:  It is a stipulated fact.

4              THE COURT:  He lives in Butte.

5              MR. STRUGAR:  So he's injured now by registration.

6    He has to let the state know most of his, you know, movements:

7    if he leaves the county for more than ten days, if he changes

8    his student status, if he changes his employment.  So that

9    itself is an injury.

10             There's all kinds of cases challenging sex offender

11   registry where this sort of injury is never contested.  Injury

12   was contested in *Doe v. Jindal* and *Doe v. Caldwell*, and the

13   courts have dispensed with it pretty quickly; of course, if

14   they had lived in the state at the time, but so does

15   Mr. Menges now.  Our position is that he was injured by being

16   maintained on the registry even when he was out of state, but

17   I don't think we even need to go there at this point.

18             And then the causation and redressability issues

19   sort of overlap with the motion for the stay arguments, and

20   that's that because Montana's only enforcing Idaho's registry,

21   it's not really Montana's officials who are doing it.

22             THE COURT:  Just as an aside, I looked at the docket

23   in the Idaho case, Judge Winmill's case --

24             MR. STRUGAR:  Yeah.

25             THE COURT:  -- some time ago.  What's the status of

1    that case?

2              MR. STRUGAR:  Argument on the pending motions to

3    dismiss and the motion for preliminary injunction are a week

4    from tomorrow, Your Honor, so I'm busy.

5              THE COURT:  All right.  You're spending time in

6    Montana and Idaho.

7              MR. STRUGAR:  Montana is still -- or, I apologize.

8    Idaho is still by Zoom, so I'll be back in Los Angeles.

9              THE COURT:  All right.

10             MR. STRUGAR:  I always appreciate a -- I had my

11   honeymoon in Missoula, so I always appreciate a chance to come

12   up here.

13             As to causation or redressability, you know, the

14   harm to Mr. Menges, Mr. Menges lives here.  The law is here.

15   The defendants are here.  The state action is here.  This is a

16   function of Montana's law carried out by Montana officials.

17   Montana did not have to wholesale adopt Idaho's registration

18   scheme which requires Mr. Menges to register, but they chose

19   to in 2005.  They're enforcing it now, and they have to defend

20   it.

21             Finally, you know, I don't think a resolution in the

22   Idaho case will necessarily affect this case for a couple

23   reasons.  I think now that Mr. Menges is here, I at least have

24   a potential mootness problem in Idaho.  He's still on the

25   registry there, but should they choose to take him off, you

1     know, I'm not sure if his case is moot or not, but it's at

2     least arguable.

3           And the language of the Montana statute that forces

4     him to register, 46-23-502(9)(b), says Menges has to register

5     if he has, quote, a "violation of a law of another state" for

6     which he "was required to register."  I don't want to be cute,

7     but that is in the past tense.  It sort of does look to, sort

8     of at least temporally, like the time of conviction, was he

9     required to register?  And if Idaho -- the relief we seek in

10    Idaho is some pretty broad declaration and injunctive relief,

11    but we don't seek to get rid of his conviction, obviously,

12    because --

13          THE COURT:  Yeah.  I read your, I read your

14    complaint in the Idaho action.

15          MR. STRUGAR:  So, you know, all Idaho will do is

16    enjoin the officials moving forward.  He will still, at least

17    textually in the words of the statute, have an injury going --

18    you know, have a registration requirement going forward on at

19    least the text of the law.

20          Now the state, in their briefing, says that they'll

21    respect sort of what the Idaho court does.  But I note that on

22    the stipulated facts that we filed, No. 28, it says that if

23    the SVOR, the Sexual or Violent Offender Registry, received

24    information that Mr. Menges is no longer required to register

25    in Idaho or another state, SVOR would forward this information

1  to the Montana attorney general's office for review and would

2  follow the recommendation of the legal department.

3          THE COURT:  Yeah.  What does that mean?

4          MR. STRUGAR:  I don't know.  It's certainly not,

5  it's certainly not a commitment that they will follow what the

6  Idaho court does.  It says they'll sort of send it to the

7  attorney general and say, "You know, what do you think about

8  this?"  So I don't know that it's the case that even all the

9  relief we ask for in Idaho would, would decide this case.

10         And so I guess I'll start -- I'll address the stay

11 motion.  Should we argue the motion separately, or am I okay

12 to address the stay motion right now?

13         THE COURT:  Argue all of the motions.

14         MR. STRUGAR:  Okay.  Great.

15         THE COURT:  Yeah.

16         MR. STRUGAR:  Thank you, Your Honor.

17         You know, as to the stay motion, we're talking --

18 there's three factors.  There's the hardship to the state and

19 the hardship to Mr. Menges, but we're already talking a little

20 bit about the "orderly course of justice" issue.  And, you

21 know, those arguments are pretty much the same; that the harm

22 is here, and it's Idaho -- or, I'm sorry, it's Montana

23 officials who are carrying it out here in Montana.

24         Both cases do ask the courts to apply similar

25 principles to the same plaintiff -- concede that.  But both

35

1   states are injuring Mr. Menges, and there are different state

2   officials, and different courts have different jurisdictions

3   over different state actors.  And then, again, even if he wins

4   his case in Idaho, I'm not sure that it really gets him

5   anything in Montana, although it might.

6         As to the other two factors, Your Honor, hardship to

7   the state, the Ninth Circuit requires a clear showing of

8   hardship to the state before entering any stay.  And Ninth

9   Circuit precedent, the *Lockyer* case, says simply defending a

10   case is not a hardship.  The state has identified no other

11   hardship.

12         And the hardship to Menges is significant.  I mean,

13   he's lived on the registry for a long time, but that doesn't

14   mean it's not a significant harm.  Every day that goes by is

15   another harm that he is potentially kicked out of a shelter or

16   denied employment.  He has to notify the state of all of his

17   movements and provide them DNA samples.  And at least in some

18   counties in Missoula, he has to pay for the pleasure of doing

19   so.  So there is, you know, an ongoing hardship to Mr. Menges.

20         THE COURT:  Well, and if he fails to register --

21         MR. STRUGAR:  It's a felony.

22         THE COURT:  -- he's subject to five years in prison

23   and a $10,000 fine.

24         MR. STRUGAR:  Absolutely, Your Honor.

25         Finally, if I could just -- you know, I think we're

1  already sort of talking about it, but I want to talk about the

2  balance of the hardships that's required for a permanent

3  injunction just to sort of outline some of the hardship to

4  Mr. Menges.  But briefly I'd like to talk about some of the

5  hardships that the state identifies and why I don't think that

6  they're significant.

7         The state identifies these five interests that are

8  served by Montana sex offender registration generally.  I note

9  that they only talk about the sex offender registry generally

10  and not sort of the hardship of taking Mr. Menges himself

11  individually off.

12         But the first interest they identify is the danger

13  of recidivism.  Mr. Menges didn't commit a crime under the law

14  today.  You can't be a recidivist if it's not a crime.

15         Impairment of law enforcement's efforts from lack of

16  information, again, there's no law enforcement interest in

17  preventing people from having oral sex.

18         Preventing victimization in resolving sex offenses,

19  again, no crime, no victim, no sex offense today under the

20  law.

21         And a reduced risk of privacy because of public

22  safety, we believe *Lawrence* and *Gryczan* shows there's no

23  public safety issues here as to Mr. Menges generally or as to

24  sodomy-only statutes.

25         And, finally, the protection of vulnerable groups in

1    the public and in general, just gay people aren't a risk to

2    the public.  They might have been thought so in 1994 but

3    they're not today, Your Honor.

4            So unless the Court has any further questions, I'd

5    like to reserve my remaining time for rebuttal.

6            THE COURT:  You are almost exactly at 35 minutes.

7            MR. STRUGAR:  Wonderful.

8            THE COURT:  So you will have ten minutes for

9    rebuttal.

10           MR. STRUGAR:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           Ms. Tokerud.

13           MS. TOKERUD:  Good afternoon, Your Honor.

14           THE COURT:  Good afternoon.

15           MS. TOKERUD:  At issue is a Montana law requiring

16   registration for those already required to register as a sex

17   offender in another state.  When someone crosses state lines

18   and comes to Montana, we require registration if another state

19   does.  It's immaterial where or when the conviction occurred

20   as long as the state imposed a registration obligation on the

21   offender.

22           I'd like to address some of the points made by

23   counsel based on your questioning.

24           Montana does not adopt wholesale the Idaho scheme.

25   Instead, we give comity to Idaho's registration requirement,

1  essentially giving that decision full faith and credit in

2  Montana.

3  　　　　As to the discussion of the statutory language with

4  the "was required," it is the state's legal interpretation of

5  the statute that if the plaintiff were not required to

6  register in Idaho, he would not have a conviction requiring

7  registration under Montana law.  To read the language as "was

8  required" as covering any offense for which someone was ever

9  required to register would include, for example, convictions

10 that have been expunged.  So in our position that doesn't make

11 sense as a reading.

12 　　　　And as to the stipulated facts that go through the

13 process that would occur should Idaho make a decision on the

14 constitutionality of the law under which the plaintiff was

15 convicted, we're not sure what Idaho will or won't do or what

16 that process would look like, but the stipulated facts set

17 forth the process that Montana follows when something like

18 that happens.

19 　　　　THE COURT:  So let's, let's, since you're talking

20 about it, let's look at paragraph 28 of the stipulated facts.

21 And that, that stipulated fact indicates that if Montana

22 received information that Menges is no longer required to

23 register in Idaho or another state, Montana would forward this

24 information to the Montana attorney general's office for

25 review and would follow the recommendation of the legal

1  department.

2          What does that mean, and what is contemplated by

3  that?  I mean, what's the Montana attorney general going to

4  review if Idaho, if the Idaho court determines that he's no

5  longer required to register in Idaho?  If he doesn't have to

6  register in Idaho, he doesn't have to register here, does he?

7          MS. TOKERUD:  That is our position, Your Honor, yes.

8          THE COURT:  Yeah.  So what is there to review?

9          MS. TOKERUD:  My understanding from the SVOR is that

10  when something like this comes up -- this is quite unusual --

11  so they would want to forward along the Idaho decision, for

12  example, to the legal department to get guidance.

13          THE COURT:  Okay.  All right.

14          MS. TOKERUD:  Going back to the intent behind the

15  law that is to protect the public, no matter what jurisdiction

16  decided that sex offender status was warranted, the Montana

17  statutory scheme maintains the responsibilities of

18  registration across state lines to be fulfilled where the

19  offender has moved.

20          Here, the plaintiff is bringing an as-applied

21  challenge.  He's conceded that Montana's law is, on its face,

22  constitutional.  We believe that the as-applied challenge

23  fails because the reasons for the initial registration in

24  Montana are not relevant to whether he has to then register in

25  Montana.  It was the Idaho court that determined that

1   registration was appropriate, and the reason that the

2   plaintiff is required to register in Montana is the fact that

3   Idaho requires registration as covered in the stipulated

4   facts.

5           The plaintiff says that he's not challenging his

6   conviction in this court, but every claim asks the Court to do

7   that.  Either he is challenging the underlying conviction,

8   which is barred by *Heck*, or he isn't, and Montana's law is

9   constitutional on its face because it relies on giving comity

10  to other states' decisions regardless of the underlying

11  conviction.

12          Here, the plaintiff --

13          THE COURT:  I'm having trouble with your argument

14  that he is, in fact, challenging the underlying conviction.  I

15  don't see where he's doing that in this case.  He's asserting

16  a due process, equal protection, Montana constitutional

17  challenge to the registration statute here in Montana.

18          So I'm really struggling with that argument, and, I

19  mean, I don't know how many times Mr. Menges has to say it

20  through his attorneys.  He's not challenging the underlying

21  conviction.  He's discharged that conviction, in fact.  So

22  why, why do you think he's challenging the underlying

23  conviction?

24          MS. TOKERUD:  When you look at the arguments

25  regarding the claims, they all rely on whether this behavior

1    was, in fact, protected conduct, whether it was consensual.

2    He's looking back at the facts that underlie that conviction,

3    and the registration requirement is a collateral consequence

4    of that underlying conviction.

5              THE COURT:  Okay.  I'm still not convinced, but

6    that's all right.  I understand your argument.

7              MS. TOKERUD:  Thank you, Your Honor.

8              Here, the plaintiff is seeking a permanent

9    injunction.  He must show actual success at this point in the

10   proceedings, not just a likelihood of success.

11             Under Montana law as applied by the Ninth Circuit,

12   the plaintiff must prove the constitutional challenge beyond a

13   reasonable doubt, and laws are presumed to be constitutional.

14   Moreover, courts decide avoiding -- avoid deciding

15   constitutional questions if the case may be disposed of on

16   other bases, and here we have, for example, the pending motion

17   to dismiss as well as the motion to stay.

18             As the Court has already discussed, the appropriate

19   level of scrutiny to apply to Montana's law is rational basis.

20   The Ninth Circuit has said that somebody doesn't have a right

21   to be free of registration requirements as a fundamental

22   right, and we believe Montana's law survives rational basis

23   because it's based on legitimate and substantial interests.

24             The plaintiff's claims are procedurally barred, as

25   we've argued in briefing.  We believe the plaintiff lacks

1   standing.  To the extent that the plaintiff is seeking a

2   permanent injunction applied to all of those with a

3   pre-*Lawrence* conviction, he lacks standing.  He cannot raise a

4   claim on behalf of any person other than himself.  This is not

5   a class action.

6          And then as argued in the briefing, we believe that

7   his claims are barred by the *Heck* doctrine.

8          THE COURT:  Let's talk a little bit about *Heck*.  It

9   seems to me -- and I'm focusing primarily on *Wilkinson v.*

10  *Dotson* -- that *Heck* really only applies to the context in

11  which in-custody prisoners circumvent the habeas process.  And

12  we know that Mr. Menges is not in custody, so why would *Heck*

13  apply at all?

14         MS. TOKERUD:  Your Honor, our position is that it

15  applies to any claim trying to get, like we discussed before,

16  to the underlying validity of the conviction.

17         THE COURT:  So your *Heck* argument is dependent upon

18  me concluding that he is, in fact, sort of mounting a

19  collateral attack on the underlying conviction in this case.

20         MS. TOKERUD:  Yes.  And counsel discussed the *Martin*

21  case with you earlier, and, there, the relief sought was to be

22  free of future prosecution.  Here, that's not the case.  He's

23  seeking relief from a collateral consequence of the

24  conviction, which is the registration requirements.  And

25  similar to the *Doe v. Hood* that was discussed, the state

1     thinks that he should try other avenues of relief first.

2          THE COURT:  It seems -- and I'm still, I'm still

3     focusing here on *Heck*.  It seems to me that Montana, the state

4     of Montana is arguing for a broad expansion of *Heck* beyond the

5     specific context, a currently in-custody prisoner seeking

6     present or future relief.  I gather you disagree with that.

7          MS. TOKERUD:  Well, we certainly understand that he

8     is not in custody.

9          THE COURT:  Right.  And if, if I'm of the opinion

10    that *Heck* really only applies in the context to in-custody

11    prisoners, wouldn't this argument of yours, of the state's, be

12    an expansion of that?

13         MS. TOKERUD:  If that's your understanding, yes.

14         THE COURT:  So why -- tell me again:  Why is my

15    understanding incorrect?

16         MS. TOKERUD:  Because we read *Heck*, including how it

17    was applied in the *Martin* case, to apply to equitable relief

18    concerning existing confinement and to -- excuse me, not to

19    instances seeking future relief; whereas, here, instead of

20    seeking relief from future prosecution, he is seeking relief

21    from something that goes to the validity of his confinement

22    and his underlying conviction.

23         THE COURT:  Okay.  All right.  I've got it.  I

24    understand your argument.

25         MS. TOKERUD:  Okay.

1           THE COURT:  Okay.  So are you still contending that

2     Mr. Menges lacks standing?

3           MS. TOKERUD:  Well, we understand that he now lives

4     in the state of Montana.  As the plaintiff argued in one of

5     their briefs, standing is based on the facts set forth in the

6     complaint.  There has been no amended complaint.  We do

7     understand he lives here now.

8           THE COURT:  Well, that's a stipulated fact.

9           MS. TOKERUD:  That's correct.

10          THE COURT:  Paragraph 20, "In March 2021, Menges

11    established residency in Butte, Montana."

12          Paragraph 21, "He currently resides in Butte and his

13    address on the Registry is a Butte address."

14          So he's, sounds like he's in Butte, and he is

15    currently registered pursuant to Montana's statutory scheme.

16          MS. TOKERUD:  (Nodded head affirmatively.)

17          THE COURT:  Correct?

18          MS. TOKERUD:  That's correct.

19          THE COURT:  Okay.

20          MS. TOKERUD:  And I believe that some of that is

21    also set forth in paragraph 18, the status of his event

22    history.

23          THE COURT:  Yes.  Right.

24          So how is, how is having your -- having the state

25    publicly disseminate your name and address on the basis that

1  you're a sex offender under Montana law not a concrete injury

2  traceable to the actions of the state?

3         MS. TOKERUD:  The state's position is that it is

4  maintaining the requirements that are imposed by -- in another

5  state, by another state, so it's not a material change.  Even

6  assuming that there is injury, you know, we clearly think that

7  the claims fail for other reasons.

8         THE COURT:  Okay.

9         MS. TOKERUD:  So assuming that the plaintiff

10  overcomes some of these procedural issues that we've just

11  discussed and gets to the merits, we believe that the claims

12  fail.  Each claim, as you and I discussed earlier, is based,

13  from our perspective, on the incorrect legal theory that

14  Montana requires registration based on the facts of the

15  underlying conviction.  That's not right as a matter of law.

16         Under the plain language of the statute, Montana

17  requires registration because another state does, and the

18  facts are irrelevant.  The facts would be relevant if the

19  first prong of the statute about an equal offense were

20  triggered, but that's not applied to the plaintiff, nor has it

21  been challenged here.

22         The plaintiff's first claim is the substantive due

23  process claim which prevents the plaintiff from the arbitrary

24  deprivation of liberty by the government.  Even assuming that

25  there's such a deprivation here, it does not give rise to a

1    federal constitutional violation.

2          To the extent that the plaintiff's substantive due

3    process claim rests on the alleged violation of *Lawrence v.*

4    *Texas*, he again is, in our mind, improperly asking the Court

5    to look at the facts of the underlying conviction.

6          Montana takes no position on the constitutionality

7    of Idaho's statute under *Lawrence*.  That's being litigated in

8    Idaho right now, based on our understanding, which is the

9    correct forum.  Idaho is not a party here.  I understand they

10   are listening in today, but they haven't defended their law in

11   this court, and we don't believe that, you know, this Court

12   should reach that law, nor need you to reach that because, as

13   a matter of law, Montana does not look to the underlying

14   conviction or statute when requiring registration here.

15         Giving full faith and credit to another state's

16   determination that someone is required to register as a sex

17   offender is not arbitrary, capricious, or conscious, shocking

18   behavior.

19         As to the equal protection claim, Montana's

20   registration law is neutral on its face.  The plaintiff has

21   not offered any fact that demonstrates discriminatory intent.

22   Montana -- excuse me.  The plaintiff is treated the same as

23   any other person required to register in another state who

24   then moves to Montana to the degree that this treatment

25   creates any type of class that's not a protected class;

1   whereas, here, a state action does not burden a fundamental

2   right or target a suspect class, the classification must be

3   upheld if there is any reasonably conceivable state of facts

4   that could provide a rational basis for the classification.

5          Here, the plaintiff has acknowledged that the state

6   does have legitimate interests in the law in general, and we

7   believe the state also has an interest in the laws applied to

8   Menges.  If the law does not apply to the plaintiff and the

9   state has to make a determination individually about whether

10   an underlying conviction requires registration, then the 2005

11   amendments to Montana's law would essentially be meaningless.

12   The legislature has an interest in the rule being one of

13   universal application.

14          And, lastly, the plaintiff raises a privacy claim,

15   arguing that under Montana law -- excuse me, under the Montana

16   Constitution, his right to privacy is violated because

17   consensual, private, same-gender, between-adult sexual conduct

18   is protected.  Again, that goes to the underlying facts, and

19   we don't believe you need to reach that.

20          On the facts before this Court, though, it is

21   unclear whether the conduct at issue would be protected

22   behavior.  For one thing, Montana's position is that it's not

23   clear that the parties would have been legally capable of

24   giving consent under the facts presented.

25          Again, we don't think you need to reach that issue,

1   though, and wade into the facts underlying the conviction

2   because the registration requirement does not hinge on the

3   fact that the plaintiff had gay sex, as he claims.  It again

4   hinges on the fact that Idaho requires registration.

5           Nor are there separate privacy concerns at issue.

6   As a civil regulatory scheme, protected information is not

7   disseminated to the public.  The information that is

8   disseminated, including the fact of the conviction, are

9   already in the public domain.  And, moreover, the law is

10  neutral and is based on legitimate and substantial state

11  interests, as argued in the briefing.

12          Because we believe that the plaintiff has failed to

13  prove his constitutional challenge, the state would request

14  that the Court deny the permanent injunction and find that the

15  law does not unconstitutionally burden the plaintiff's rights

16  and that the state interests outweigh the burden.

17          We've also filed the motion to stay pending the

18  outcome in Idaho to see how that would play into this court.

19  As counsel indicated, argument in that is set for April 7 and

20  is forthcoming.

21          We've also filed the motion to dismiss the claims

22  alleging that the claims are *Heck*-barred and that he has

23  failed to state a claim for relief.

24          So I'm happy to answer any of your questions.

25          THE COURT:  Understood.

1          MS. TOKERUD:  Okay.

2          THE COURT:  All right.  Thank you, Ms. Tokerud.

3          MS. TOKERUD:  Thank you, Your Honor.

4          THE COURT:  Mr. Strugar, you may rebut briefly.

5          MR. STRUGAR:  I will be brief, Your Honor.

6          As to the issue of the Idaho case, no matter --

7   again, this is a point I already made in my initial argument,

8   but no matter what Idaho does, the text of the Idaho law will

9   still require registration.  It may enjoin Idaho officials

10  from enforcing it, but we're not going to change the law.

11  That's not what federal courts do.  The recent case of *Barr v.*

12  *American Association of Political Consultants* talks a good bit

13  about this, about what happens when either -- you know, even

14  after successfully changing -- successfully facially

15  challenging the law, it still doesn't rewrite it.  It enjoins

16  officials.  It sort of relies on vertical and *stare decisis* to

17  make sure that that ruling is upheld elsewhere, but it doesn't

18  change it.

19          And so under Idaho law he will still be required to

20  register, and under Montana law he will still be required to

21  register.  So we're simply asking that the state -- that the

22  Court here enjoin officials that it has jurisdiction over,

23  over a law in this state, not over anything that's gonna

24  happen in Idaho.

25          The state, within its briefing and its arguments,

1 continues to say that we are challenging the facts of his

2 conviction.  That's not exactly true.  You know, our initial

3 position is that any pre-*Lawrence* conviction should be

4 protected from registration today, no matter what the

5 underlying facts are, because it's been based on

6 since-invalidated statutes.

7          But sort of as an in-the-alternative argument, we do

8 argue that even if you have to look at the facts of

9 Mr. Menges's convictions, the arguments still hold up that

10 it's still protected conduct.

11          A quick point about the standing being assessed

12 based on the facts pled in the complaint, that is, of course,

13 the rule.  But Federal Rule of Civil Procedure 15(b)(2) says

14 if an issue is not raised in the pleadings and it's tried by

15 the parties, it's treated as if it's pled.  Here, we have

16 stipulated facts that he lives in Butte, and the Court has

17 seen his own registration page.  If an amended complaint is

18 needed, we're happy to file an amended complaint.

19          The argument that he has other avenues of relief,

20 again, his ability to file a postconviction motion in Idaho

21 expired in 1995.  You know, we believe the state is trying to

22 serve -- again, pass the buck to Idaho to avoid taking

23 responsibility for Montana officials' own actions.

24          And when the state says that, you know, "Oh, we're

25 just enforcing Idaho's laws," without regard to the

51

1   constitutionality or the facts of the underlying conviction,

2   again, it's an admission by the state that they're not taking

3   some pretty minor action to attempt that its officials are

4   acting within the law.

5           We don't know how many other people are in

6   Mr. Menges's situation.  We've issued discovery, but we

7   probably won't get answers.  It sounds like this case might be

8   resolved before then.  But there's only three states left that

9   still require registration for pre-*Lawrence* sodomy

10  convictions:  It's Idaho, Mississippi, and South Carolina.  We

11  don't believe that there would be much of a requirement in the

12  state, even if we got a declaration at all.  Pre-*Lawrence*

13  sodomy convictions are protected from registration by the

14  substantive Due Process Clause.  We don't think it would

15  affect more than a handful of people, although admittedly we

16  don't know.

17          Finally, the state, the state makes a point about

18  it's in question about the ability of the other -- the

19  16-year-olds to consent.  I'd just point out Montana's age of

20  consent is 16.  Montana just considers 16-year-olds capable of

21  consent, straight up.

22          So just to close, Your Honor, you know, *Lawrence*

23  held, quote, "When homosexual conduct is made criminal by the

24  law of the State, that declaration in and of itself is an

25  invitation to subject homosexual persons to discrimination

52

1    both in the public and in the private spheres," end quote.

2              Montana is forcing Mr. Menges to register for having

3    gay sex in 1993.  It's a small part of a dark history against

4    gays and lesbians in this country.  It's a history that's

5    barely a history, where people who are alive today can

6    remember where people weren't just criminalized but

7    institutionalized, sterilized, and lobotomized for loving who

8    they loved; where, in my own memory, a plague killed hundreds

9    of thousands of gay men in this country while the federal

10   government did little to stop it, and millions of Americans

11   cheered it on because of who the victims were; and where, four

12   years after Randall Menges was convicted in the state directly

13   to Montana's west, in the state directly to Montana's south

14   three young men tied another young man to a barbed-wire fence

15   and beat him within an inch of his life, to which he

16   eventually succumbed to those injuries, just because he was

17   gay.

18             I'm not asking the Court to fix any of these old

19   wrongs.  This Court can't do that, and we're not asking it to.

20   But it can fix this one, and we are asking the Court to fix

21   this one.

22             We ask the Court to deny the motion to dismiss, deny

23   the motion to stay, and grant Mr. Menges's injunctive relief

24   against his registration requirement.

25             Thank you.

1          THE COURT:  All right.  Thank you.

2          Well, the matter is fully submitted.  I want to

3  thank counsel for the arguments this afternoon.  They were

4  very good and very helpful, and I will endeavor to get a

5  ruling out as quickly as I can.

6          So take care, everybody.  We're in recess.  Thank

7  you.

8          MR. STRUGAR:  Thank you, Your Honor.

9          MS. TOKERUD:  Thank you, Your Honor.

10       (Proceedings were concluded at 14:44:25.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2           I, JoAnn Jett Corson, a Registered Diplomate

3  Reporter and Certified Realtime Reporter, certify that the

4  foregoing transcript is a true and correct record of the

5  proceedings given at the time and place hereinbefore

6  mentioned; that the proceedings were reported by me in machine

7  shorthand and thereafter reduced to typewriting using

8  computer-assisted transcription; that after being reduced to

9  typewriting, a certified copy of this transcript will be filed

10  electronically with the Court.

11           I further certify that I am not attorney for, nor

12  employed by, nor related to any of the parties or attorneys to

13  this action, nor financially interested in this action.

14           IN WITNESS WHEREOF, I have set my hand at Missoula,

15  Montana this 11th day of June, 2021.

16

17                          /s/ JoAnn Jett Corson

18                          _____
                            JoAnn Jett Corson
19                          United States Court Reporter

20

21

22

23

24

25